Mark SWANK and James J. McCoy, Jr., Individually and in Their Derivative Capacity on Behalf of Automated Marine Propulsion Systems, Inc., Appellants,

v.

Lloyd R. CUNNINGHAM et al., Appellees.

No. 11–06–00172–CV.

Court of Appeals of Texas, Eastland.

March 27, 2008.

Rehearing Overruled May 22, 2008.

Clay Rawlings, Keith Hampton, Hampton & Rawlings, Houston, R. Perry McConnell, David S. O'Neil, O'Neil & McConnell, PLLC, The Woodlands, for Appellants.

Catherine Bukowski Smith, Paul Edward Stallings, Vinson & Elkins L.L.P., Dori Elana Kornfeld, R. Paul Yetter, Douglas S. Griffith, Yetter, Warden & Coleman, L.L.P., Fred Knapp, Jr., Laura B. Rowe, Gregg C. Laswell, Hicks Thomas & Lilienstern, LLP, John B. Wallace, R. Stephen Ferrell, Lyman, Twining, Weinberg & Ferrell, Lori A. Swann, Lloyd R. Cunningham, Cunningham Law Group, Richard L. Flowers, Jr., Kevin Joseph McEvily, McEvily & Flowers, Alan Neil Magenheim, Magenheim & Associates, David Hurst Brown, Brown & Kornegay LLP, Houston, for Appellees.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

This is essentially a legal malpractice case brought by Mark Swank and James McCoy, Jr. against their attorneys and other attorneys involved in the underlying case of *Swank v. Sverdlin,* 121 S.W.3d 785 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In this cause, Swank and McCoy alleged claims for legal malpractice, breaches of fiduciary duties, conspiracy, conversion, and fraud.

The underlying litigation involved a dispute over control of Automated Marine Propulsion Systems, Inc. (AMPS), a company founded by Anatoly Sverdlin and one in which he initially owned 100% of the stock. In that suit, Sverdlin individually and derivatively on behalf of AMPS sued Swank, McCoy, the directors of AMPS, others who had invested in AMPS, and the law firm for AMPS. After Sverdlin obtained a substantial jury verdict against all of the defendants, Sverdlin settled his individual and derivative claims against Gardere, Wynne, Sewell & Riggs (the law firm that had represented AMPS when the investors loaned it $2 million) and its partner David Jungman (Gardere Wynne). Ultimately, the judgment of the trial court in *Swank v. Sverdlin* was reversed, and the court of appeals rendered a take-nothing judgment against Sverdlin on all his claims against the non-settling defendants. 121 S.W.3d 785.

In this suit, Swank and McCoy are complaining about the failure of AMPS to receive a portion of the $20 million settlement paid by Gardere Wynne to Sverdlin. Because their complaint rests on an assumption that AMPS had a valid jury verdict against Gardere Wynne, Swank and McCoy must show that they were stockholders of AMPS to maintain their derivative claims. Swank and McCoy had been granted options by Sverdlin on his AMPS stock. They attempted to exercise those options. However, Sverdlin refused to comply with the option contracts, and there is no evidence that Sverdlin ever delivered the AMPS stock to them.

In this cause, the trial court below granted summary judgments in favor of all the appellee attorneys. Because Swank and McCoy have no standing and because,

even if they had standing, their claims lack merit, we affirm.

## Parties to this Appeal

Appellants, Swank and McCoy, were defendants in the underlying litigation. There are five groups of appellees in this cause: (1) Aubrey Calvin and John L. Verner and their law firm of Calvin, Gibbs & Verner (Calvin Verner) represented Swank and McCoy and some of the other defendants in the underlying litigation; (2) Mike Malone and his law firm of Battle Fowler, L.L.P. (Battle Fowler) were listed as being "of counsel" to Calvin Verner in the underlying litigation; (3) Lloyd R. Cunningham and Marti Batson and their law firm of the Cunningham Law Group and Kevin McEvily, Jr. and Richard L. Flowers, Jr. and their law firm of McEvily & Flowers (the Cunningham Group) represented Sverdlin individually and in his representative capacity on behalf of AMPS in the underlying litigation; (4) Beck, Redden & Secrest (Beck Redden) was substituted as counsel for Swank after the jury reached its verdict in the underlying litigation; and (5) Larry Veselka and Craig Smyser and their law firm of Smyser, Kaplan & Veselka L.L.P. (Smyser Kaplan) were substituted as counsel for McCoy after the jury reached its verdict in the underlying litigation.

## Background Facts

Anatoly Sverdlin, an engineer from Russia, established AMPS in Houston to repair diesel marine engines on large ships. Initially, Sverdlin was the sole owner and chief executive officer of AMPS. He subsequently developed and obtained patents for a new fluid control injection system (FCIS), which allegedly improved engine efficiency and lowered costs. Sverdlin then decided to phase out of the engine repair business and concentrate on marketing the new FCIS.

After shifting away from engine repairs, AMPS began to operate at a loss, losing over $125,000 in 1995. Early in 1995, AMPS hired McCoy as vice president of industrial sales and Swank as president. Swank was to develop a business plan to attract investors for AMPS. As an incentive, Sverdlin granted Swank and McCoy options on some of his shares of AMPS's stock. These stock options gave Swank and McCoy an opportunity to each own up to twenty percent of AMPS.

McCoy introduced Sverdlin to an investor, Marvin Chudnoff, who in turn recruited additional investors. Chudnoff and three other individuals created AMPS Investment, L.L.C. AMPS Investment then created L.D.E. Associates, L.L.C. (LDE), which was the entity through which AMPS Investment and Louis Dreyfus Natural Gas Holdings Corp. (LDNGH) invested in AMPS. Jeffrey Sussman of AMPS Investment signed documents as LDE's president. There were lengthy negotiations for AMPS to obtain a $2 million loan from LDE to continue development and marketing of the FCIS. As president of AMPS, Swank often spoke on behalf of AMPS, and he hired Gardere Wynne to represent AMPS in the loan transaction. Sverdlin and his wife, who were the directors of AMPS at the time, signed a statement giving the AMPS board's approval to an initial June 1996 letter agreement for the loan, and later Sverdlin signed the final loan documents. The loan agreement was finalized in September 1996, and it gave LDE the right to choose two of the three directors. LDE chose Chudnoff and Sussman.

Unfortunately, the FCIS did not function as expected. AMPS lost money, and the parties began to disagree on how AMPS should be run. Sverdlin believed

that the board of directors had stopped listening to him and that the board was taking control of AMPS, causing it to become unmanageable. Sverdlin threatened to fire Swank and McCoy and take back his patents. Swank and McCoy attempted to exercise their stock options in AMPS,[1] but there is no evidence that Sverdlin ever endorsed or transferred any of his AMPS shares to them. The AMPS board decided that Sverdlin was damaging the company in violation of his employment agreement and terminated his employment in January 1997. AMPS had been operating at a loss. AMPS's net income after taxes in 1996 revealed over half a million dollars in losses. To continue operations, AMPS borrowed additional money directly from LDNGH.

AMPS and LDE obtained a temporary injunction against Sverdlin to keep him away from AMPS and its customers. Sverdlin filed a counterclaim individually and on behalf of AMPS in his derivative capacity seeking declaratory relief and alleging numerous causes of action, including fraud, breach of contract, breach of fiduciary duty, negligence, gross negligence, conspiracy, tortious interference, and usury. Sverdlin also sought declaratory relief that he was the 100% owner of AMPS. Subsequently, the trial court modified the injunction to freeze all of the parties' contractual rights and appointed a receiver to oversee AMPS's operations. The trial court then realigned the parties by making Sverdlin the plaintiff in his individual capacity and in his derivative capacity on behalf of AMPS.

The defendants in the first trial were AMPS, McCoy, Swank, Chudnoff, Sussman, LDNGH, LDE, and Gardere Wynne. Sverdlin, in his individual capacity, sued Gardere Wynne alleging malpractice based on conflicts of interest. Sverdlin also asserted derivative claims against Gardere Wynne but did not sue the firm derivatively for malpractice. Except for Gardere Wynne, which was represented by Fulbright & Jaworski, all of the defendants were represented by Calvin Verner. Battle Fowler was listed as being "of counsel" to Calvin Verner. During the first trial, the Cunningham Group represented Sverdlin individually and in his representative capacity.

After a six week jury trial, the jury awarded approximately $1.5 billion to Sverdlin and AMPS (on Sverdlin's derivative claims). After the verdict but before the judgment was entered, there were a number of changes in the defendants' legal representation:

Calvin Verner withdrew as counsel for Swank, McCoy, Chudnoff, Sussman, and LDNGH.

Beck Redden was substituted as counsel for Swank.

Smyser Kaplan was substituted as counsel for McCoy.

Brendan Sullivan, John Buckley, Jr., and David Keltner were substituted as counsel for LDNGH.

Calvin Verner continued to serve as counsel for LDE and AMPS, and Jack O'Neill was added as counsel for LDE.

AMPS's receiver asked for and received permission to hire Brown, Parker & Leahy as corporate counsel for AMPS. The order was signed on December 29, 1998.

---

1. In its opinion, the Houston First Court of Appeals stated that "Swank and McCoy exercised their stock options in AMPS." *Swank*, 121 S.W.3d at 790. However, there is no evidence in the record that Sverdlin performed his side of the option contract by delivering stock to them or that there was a judicial declaration that Sverdlin was obligated to perform under the option contracts.

Even though Sverdlin had not pleaded a derivative claim on behalf of AMPS for malpractice against Gardere Wynne, the trial court's charge included a question asking whether Gardere Wynne had committed negligence against AMPS. The jury found that Gardere Wynne had committed negligence against AMPS. Against Gardere Wynne, the jury awarded $24.5 million in damages to Sverdlin individually and $35 million to Sverdlin derivatively on behalf of AMPS as a result of its findings that Gardere Wynne had been negligent. Because there were no pleadings to support the award to AMPS against Gardere Wynne, Lloyd R. Cunningham (Sverdlin's counsel) then filed a trial amendment adding a malpractice claim by AMPS against Gardere Wynne.

Before the judgment was entered, Sverdlin announced that he and Gardere Wynne had reached a settlement in principle. Sverdlin agreed to withdraw the trial amendment that he had filed to add a derivative legal malpractice claim on behalf of AMPS, and AMPS agreed to relinquish all claims against Gardere Wynne. On January 7, 1999, Swank, McCoy, and others filed a joint request for a fairness hearing on the derivative settlement. Before the fairness hearing was held, the court entered an interlocutory judgment on January 13, 1999. The interlocutory judgment denied Sverdlin's trial amendment on behalf of AMPS, approved the settlement of all claims against Gardere Wynne, set aside the jury's answers relating to the conduct of Gardere Wynne, and adjudged that Sverdlin take nothing by his claims against Gardere Wynne. Under the settlement, the entire $20 million was to be paid to Sverdlin individually.

Prior to the trial court's interlocutory judgment approving the settlement, Smyser Kaplan was successful in obtaining an order from the trial court to disregard all of the jury's liability findings against McCoy. However, at the fairness hearing on January 25, Lloyd Cunningham (Sverdlin's counsel) argued that the defendants, which included Swank and McCoy, should not be allowed to object to the fairness to AMPS of any settlement because the jury had found them to be wrongdoers. No one objected to the settlement. Near the end of the fairness hearing, the trial court agreed that the malpractice claim on behalf of AMPS would not have survived and indicated that it would have set aside that verdict in any event. The trial court then found that the settlement between Sverdlin and Gardere Wynne met "all the requirements of substantial fairness" to AMPS and approved the settlement.

The Gardere Wynne settlement agreement required formal ratification by AMPS. Brown, Parker & Leahy, the firm selected by the receiver, prepared the ratification papers and circulated those papers to Sverdlin and the new AMPS directors who had been elected after the trial court judgment was entered. After the trial court had declared that Sverdlin was the 100% owner of AMPS, Sverdlin had appointed a new board of directors and president of AMPS. The new board ratified the settlement and authorized the new president to sign the settlement agreement. The new president then executed the settlement agreement.

After several post-verdict motions and hearings, the trial court disregarded certain jury findings, reduced the verdict to approximately $235 million in damages, returned the patents to Sverdlin, and declared that 100% of AMPS's stock was owned by Sverdlin. On January 25, 1999, the trial court signed a final judgment. The judge of the trial court resigned, and the case was transferred to another trial judge. After further postjudgment hear-

ings, the judgment was reduced to approximately $180 million.

Swank, McCoy, Chudnoff, Sussman, LDE, and LDNGH appealed the $180 million final judgment. McCoy also appealed the trial courts declaratory judgment ruling that awarded Sverdlin 100% ownership of AMPS. Sverdlin in his derivative capacity cross-appealed parts of the judgment that disregarded the jury's findings as to McCoy. The Houston First Court of Appeals reversed the trial court "in all things" and rendered judgment that Sverdlin, individually and on behalf of AMPS, take nothing against the appellants. *Swank*, 121 S.W.3d 785.

On June 3, 2005, Swank filed this suit in his individual capacity and derivatively on behalf of AMPS against the Cunningham Group, Calvin Verner, Battle Fowler, and Beck Redden (the law firm that substituted as counsel for him after the jury reached its verdict in the underlying litigation). McCoy then intervened suing the Cunningham Group, Calvin Verner, Battle Fowler, and Smyser Kaplan (the law firm that substituted as counsel for him after the jury reached its verdict in the underlying litigation). Swank and McCoy based all of their claims on their asserted 40% interest in AMPS (20% each) and claimed that the attorneys had deprived them of a valuable property right—AMPS's $35 million judgment against Gardere Wynne—when Sverdlin was allowed to receive the entire $20 million Gardere Wynne settlement and AMPS received none of the settlement proceeds. Swank and McCoy alleged that the "Thirty–Five Million Dollar property interest was a valuable property right of AMPS and, by extension, Swank and McCoy (both 20% shareholders)." They further alleged that their damages included but were not limited to "the loss of AMPS'[s] $35,000,000.00 jury award and

[their] interests in the $20,000,000.00 Gardere settlement."

Smyser Kaplan and Beck Redden filed motions for summary judgment. On January 19, 2006, the trial court entered orders granting summary judgment in favor of Smyser Kaplan against McCoy and in favor of Beck Redden against Swank. Later, the Cunningham Group, Calvin Verner, and Battle Fowler filed motions for summary judgment. On May 1, 2006, the trial court signed a final judgment granting summary judgment in favor of the Cunningham Group, Calvin Verner, and Battle Fowler. This appeal by Swank and McCoy followed.

### Swank's and McCoy's Claims in this Cause

Swank's and McCoy's claims in this cause relate to the $20 million Gardere Wynne settlement in the underlying litigation. For example, they made the following allegations in their petition:

Each of [the appellee lawyers] breached one or more of the duties they owed to AMPS, Swank, and McCoy (both 20% shareholders in AMPS), in the handling of [Sverdlin's] trial amendment [adding a derivative claim on behalf of AMPS for legal malpractice against Gardere Wynne], the Gardere [Wynne] settlement, the $20 million settlement proceeds, and the application of the credit those [settlement] proceeds allowed.

In Swank and McCoy's appellate brief, they characterize their claims as being based on "acts centered around a $20,000,000 settlement in the prior litigation-significant claims belonging to AMPS were compromised as part of the settlement, but AMPS received none of the proceeds of the settlement." Essentially, Swank's and McCoy's claims boil down to two propositions. First, they assert that AMPS lost its $35 million jury verdict and

did not receive any proceeds from the Gardere Wynne settlement because the appellee lawyers either committed negligence or breached their fiduciary duties.[2] Second, they assert that, as 20% shareholders in AMPS, they were damaged because of the damage to AMPS.

In their petition, Swank and McCoy alleged that the Cunningham Group breached its fiduciary duties to AMPS and to them in their capacities as shareholders in AMPS in the following ways: (a) entering into an agreement with Gardere Wynne to settle Sverdlin's individual causes of action for $20 million conditioned upon the Cunningham Group withdrawing AMPS's trial amendment for legal malpractice against Gardere Wynne post-verdict; (b) entering into an agreement with Gardere Wynne to settle Sverdlin's individual causes of action for $20 million conditioned upon the Cunningham Group settling all of AMPS's causes of action against Gardere Wynne; (c) entering into an agreement with Gardere Wynne to settle Sverdlin's individual causes of action for $20 million conditioned upon the Cunningham Group agreeing not to authorize or assign the right to maintain a derivative action against Gardere Wynne on behalf of AMPS; (d) withdrawing AMPS's trial amendment post-verdict thereby discharging AMPS's $35 million jury verdict against Gardere Wynne; (e) failing to protect AMPS, by allowing a settlement credit to be assessed against AMPS for the $20 million received by Sverdlin; (f) failing to protect AMPS's settlement proceeds; (g) failing to protect AMPS's assets; (h) failing to prevent the sale of AMPS's assets; and (i) failing to prevent AMPS's dissolution. Swank and McCoy alleged breach of fiduciary duty claims—identical to those listed in (e) through (i) above—against Calvin Verner and Battle Fowler. Additionally, Swank and McCoy alleged that Calvin Verner and Battle Fowler breached their fiduciary duties in failing to object to and in failing to prevent the Cunningham Group from undertaking the acts listed in (a) through (d) above. Swank and McCoy made similar breach of fiduciary duty allegations against Beck Redden and Smyser Kaplan.

Swank and McCoy alleged the same acts or omissions as negligence allegations against Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan. Specifically, Swank and McCoy alleged that these four appellees committed negligence in the same respects: (a) affirmatively consenting to the withdrawal of the trial amendment; (b) not objecting to the withdrawal of the trial amendment; (c) not appealing the withdrawal of the trial amendment; (d) not asking the court to hold all or a portion of the proceeds of the Gardere Wynne settlement in the court's

---

**2.** In Swank's and McCoy's second amended petition, which was the live pleading when Smyser Kaplan and Beck Redden filed their motions for summary judgment, they alleged the same twenty-three acts and omissions as grounds for negligence and breaches of fiduciary duty against Beck Redden and Smyser Kaplan. They also alleged the same twenty-three acts and omissions as grounds for negligence against Calvin Verner and Battle Fowler. All twenty-three of the alleged acts and omissions related in some manner to the Gardere Wynne settlement. In essence, Swank and McCoy alleged legal malpractice claims that were based on negligence. Any

attempt to recast the negligence allegations as breach of fiduciary duty allegations would constitute an improper fracturing of the legal malpractice claim. *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.,* 97 S.W.3d 179, 189 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Cuyler v. Minns,* 60 S.W.3d 209 216 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Sledge v. Alsup,* 759 S.W.2d 1, 2–3 (Tex.App.-El Paso 1988, no writ). However, the outcome of this appeal remains the same whether Swank's and McCoy's claims are characterized as negligence claims, breach of fiduciary duty claims, or both.

registry; (e) failing to ask the court to have all or a portion of the proceeds of the Gardere Wynne settlement held by the receiver; (f) failing to seek a writ of mandamus directing the trial court to hold all or a portion of the proceeds of the Gardere Wynne settlement in the court's registry pending appeal; (g) failing to seek a writ of mandamus directing the trial court to have all or a portion of the proceeds of the Gardere Wynne settlement held by the receiver pending appeal; (h) failing to follow Aubrey Calvin's advice in his memorandum dated January 4, 1999; (i) failing to advise them that the Gardere Wynne settlement proceeds were being diverted away from AMPS; (j) failing to demand that Gardere Wynne not insist on withdrawal of the trial amendment as a condition of settlement; (k) failing to demand that Gardere Wynne place the proceeds of the Gardere Wynne settlement into the court's registry; (*l*) failing to demand that Gardere Wynne place the proceeds of the Gardere Wynne settlement into the hands of the receiver; (m) failing to demand that the Cunningham Group, the Calvin Group, and the Battle Fowler Group refrain from withdrawing the trial amendment on behalf of AMPS; (n) failing to demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver object to the withdrawal of the trial amendment; (o) failing to demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver file a trial amendment; (p) failing to demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver appeal the withdrawal of the trial amendment; (q) failing to demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver apply for a court order to hold all or a portion of the proceeds of the Gardere Wynne settlement in the court's registry; (r) failing to demand that the Cunningham

Group, the Calvin Group, the Battle Fowler Group, and the receiver ask the court to have all or a portion of the proceeds of the Gardere Wynne settlement held by the receiver; (s) failing to demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver seek a writ of mandamus directing the trial court to order that all or a portion of the proceeds of the Gardere Wynne settlement be held in the court's registry; (t) failing to demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver seek a writ of mandamus directing the trial court to have all or a portion of the proceeds of the Gardere Wynne settlement held by the receiver; (u) failing to object to the settlement of all of AMPS's claims; (v) failing to object to the extraction of the settlement credit from AMPS instead of Sverdlin; and (w) failing to fully protect Swank's and McCoy's interests in the application of the settlement credit.

In addition to the above claims, Swank and McCoy alleged that the Cunningham Group converted AMPS's $35 million jury verdict against Gardere Wynne and that Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan conspired with the Cunningham Group to convert the jury verdict. Swank and McCoy also alleged a fraud claim against Lloyd Cunningham in his individual capacity. Based on the alleged breaches of fiduciary duty by all appellee lawyers, Swank and McCoy sought a disgorgement of legal fees paid to the appellee lawyers.

### Appellees' Motions for Summary Judgment

The appellee lawyers filed traditional motions for summary judgment. Smyser Kaplan moved for summary judgment on the following grounds: (a) McCoy's derivative claims on behalf of AMPS failed for

two independent reasons: (1) because Smyser Kaplan never represented AMPS, McCoy lacked standing; and (2) AMPS's board of directors expressly ratified the settlement; (b) McCoy's "individual" claims failed because the damages he sought to recover belonged to AMPS; (c) McCoy's derivative and individual claims failed because his pleadings and interrogatory answers established that the damages he sought to recover were impermissibly speculative; and (d) McCoy's non-malpractice claims for fee forfeiture and conspiracy failed because they constituted an impermissible attempt to fracture a legal malpractice claim and, alternatively, McCoy's claim for fee forfeiture failed because he paid no fees and his claim for "conspiracy to convert the AMPS verdict" failed because a jury verdict cannot be converted.

Beck Redden moved for summary judgment on the following grounds: (a) Swank's derivative claim on behalf of AMPS failed because Beck Redden never represented AMPS; and (b) Swank did not allege any direct personal damage and, therefore, his individual claim failed. Beck Redden also incorporated by reference into its motion for summary judgment all of Smyser Kaplan's grounds for summary judgment.

The Cunningham Group moved for summary judgment on the following grounds: (a) the statute of limitations barred Swank's and McCoy's claims; (b) Swank and McCoy lacked standing to assert individual or derivative claims against the Cunningham Group for the following reasons: (1) they had no standing to assert individual malpractice and breach of fiduciary duty claims because they were not and had never been in privity with the Cunningham Group; (2) they had no standing to assert derivative claims on behalf of AMPS because they were not and had never been shareholders in AMPS; and (3) they had no standing to assert derivative claims on behalf of AMPS for breach of fiduciary duty by the Cunningham Group because there was no privity between AMPS and the Cunningham Group at the time of the Gardere Wynne settlement; (c) collateral estoppel, ratification, and waiver barred Swank's and McCoy's derivative claims on behalf of AMPS; (d) there was no evidence of any underlying damage to AMPS to support the malpractice jury verdict against Gardere Wynne; (e) Swank's and McCoy's claims failed because their damage and causation theories were fatally speculative as a matter of law; (f) Swank's and McCoy's conversion claim failed because there can be no conversion of a jury verdict; and (g) Swank's and McCoy's fraud claims against Lloyd Cunningham failed because there was no evidence that he made any fraudulent statement upon which they relied to their detriment and because of which they sustained damages.

Battle Fowler moved for summary judgment on the following grounds: (a) Battle Fowler ceased representing any party in connection with the underlying litigation immediately after the jury's verdict on October 27, 1998, and, therefore, it owed no duty to any party thereafter; (b) there was no evidence that Battle Fowler represented any party in connection with the underlying litigation immediately after the jury's verdict on October 27, 1998, and in no event after November 4, 1998, and there was no evidence that Battle Fowler owed any duty to any party thereafter (Battle Fowler also moved for a no-evidence summary judgment on this ground); (c) the statute of limitations barred Swank's and McCoy's claims; (d) there was no evidence of fraudulent concealment on the part of Battle Fowler sufficient to toll the statute of limitations (Battle Fowler also moved for a no-evidence summary

judgment on this ground); (e) Swank's and McCoy's claims were barred by the doctrines of res judicata and/or collateral estoppel; (f) Swank's and McCoy's claims were barred by AMPS's ratification of the Gardere Wynne settlement; (g) Swank's and McCoy's damage and causation theories were fatally speculative as a matter of law; (h) neither Swank nor McCoy had standing to bring malpractice or breach of fiduciary duty claims in their individual capacities; (i) Swank's and McCoy's "conspiracy to convert" claims failed because a verdict cannot be converted and because there was no conspiracy; (j) the evidence conclusively established that Battle Fowler was not a part of any alleged conspiracy; (k) there was no evidence that Battle Fowler ever knew of or participated in any alleged conspiracy (Battle Fowler also moved for a no-evidence summary judgment on this ground); and (*l*) neither Swank nor McCoy could obtain fee disgorgement from Battle Fowler because neither paid any fees to Battle Fowler. Battle Fowler filed a second motion in which it moved for a no-evidence summary judgment on the ground that there was no admissible summary judgment evidence to support an award of damages to Swank and McCoy individually and derivatively on behalf of AMPS.

Calvin Verner moved for a traditional summary judgment on the following grounds: (a) Calvin Verner did not represent Swank or McCoy after December 3, 1998, and, once the directors and shareholders of AMPS retained their own counsel, no party looked to Calvin Verner for legal advice, counsel, or assistance; (b) AMPS's receiver, not Calvin Verner, controlled any derivative claims on behalf of AMPS; (c) the statute of limitations barred Swank's and McCoy's claims; (d) Swank's and McCoy's claims were barred by AMPS's ratification of the Gardere Wynne settlement; (e) Swank's and McCoy's damage and causation theories were fatally speculative as a matter of law; (f) neither Swank nor McCoy had standing to bring malpractice or breach of fiduciary duty claims in their individual capacities; (g) Swank's and McCoy's "conspiracy to convert" claims failed because a verdict cannot be converted and because there was no conspiracy; and (h) neither Swank nor McCoy could obtain fee disgorgement from Calvin Verner because neither paid fees to Calvin Verner. Calvin Verner moved for a no-evidence summary judgment on the grounds that there was no evidence of the following matters: (a) that any defendant's alleged breach of duty was a direct cause of Swank's and McCoy's damages; (b) that Swank and McCoy sustained any damages whatsoever; (c) that the trial court would have sustained any objection made to the Gardere Wynne settlement at the "fairness hearing" in the underlying case; (d) that there was any valid legal basis for an objection to the Gardere Wynne settlement at the "fairness hearing" in the underlying case; (e) that any evidence would or could have been produced at the "fairness hearing" in the underlying case which would or could have affected the outcome of the "fairness hearing"; (f) that Sverdlin would have gone forward with the underlying Gardere Wynne settlement if he had been required to split the money with AMPS; (g) that there was any "conspiracy" between the defendants to deprive AMPS of any monies from the Gardere Wynne settlement; (h) that, had AMPS received proceeds from the Gardere Wynne settlement, there would have been any money left over for any shareholders after AMPS paid its debts to all outstanding creditors; (i) that the FCIS system which was the subject of the underlying case would have ever worked; (j) that the shareholders of AMPS would have reached an agreement

on how to spend any portion of the settlement monies; (k) that Swank and McCoy would have ultimately netted any recovery from any hypothetical portion of the Gardere Wynne settlement that AMPS would or could have received; and (*l*) that Swank and McCoy could have proved the "case within a case" on causation or damages which would have been necessary for them to recover in this legal malpractice case.

Swank and McCoy filed responses to appellees' motions for summary judgment, and the trial court conducted hearings on the motions. The trial court granted summary judgments to all appellees without specifying the ground or grounds upon which it relied in granting the motions. In this appeal, Swank and McCoy present forty appellate issues challenging the trial court's granting of summary judgment to appellees.

### Standard of Review

■■■ Where, as here, a trial court's order granting summary judgment does not specify the ground or grounds relied upon for its ruling, summary judgment will be affirmed on appeal if any of the summary judgment grounds advanced by the movant are meritorious. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989). A trial court must grant a traditional motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). In order for a defendant to be entitled to summary judgment, it must either disprove an element of each cause of action or establish an affirmative defense as a matter of law. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997).

Once the movant establishes a right to summary judgment, the nonmovant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979). When reviewing a traditional summary judgment, the appellate court considers all the evidence and takes as true evidence favorable to the nonmovant. *Am. Tobacco Co.,* 951 S.W.2d at 425; *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). The appellate court "must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented" and may not ignore "undisputed evidence in the record that cannot be disregarded." *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755, 757 (Tex.2007).

■■■ We must review a no-evidence summary judgment under the same standard as a directed verdict. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750–51 (Tex.2003). Accordingly, we examine the record in the light most favorable to the nonmovant and disregard all contrary evidence and inferences. *Id.; Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002). A trial court must grant a proper no-evidence motion for summary judgment unless the nonmovant produces more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i); *Wal–Mart,* 92 S.W.3d at 506. We may not consider any evidence presented by the movant unless it creates a fact question. *Binur v. Jacobo,* 135 S.W.3d 646, 651 (Tex.2004).

### Standing

■■■ The Cunningham Group moved for a traditional summary judgment on the ground that Swank and McCoy lacked standing to assert derivative claims on behalf of AMPS because they were never

shareholders in AMPS. Standing is a component of subject-matter jurisdiction, and a plaintiff must have standing to maintain a suit. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993); *Spurgeon v. Coan & Elliott*, 180 S.W.3d 593, 597 (Tex.App.-Eastland 2005, no pet.). Because the Cunningham Group challenged Swank's and McCoy's standing in a traditional summary judgment, we apply the standard of review that applies to traditional motions for summary judgment. *Kilpatrick v. Kilpatrick*, 205 S.W.3d 690, 700 (Tex.App.-Fort Worth 2007, pet. denied).[3]

■■■ A cause of action against one who has injured a corporation belongs to the corporation and not to the shareholders. A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong. *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990). Thus, a shareholder who seeks individual redress based on allegations concerning wrongs done to a corporation lacks standing. *Redmon v. Griffith*, 202 S.W.3d 225, 233 (Tex.App.-Tyler 2006, pet. denied).

■■■ A cause of action for injury to the property of a corporation or for impairment or destruction of its business is vested in the corporation, as distinguished from its shareholders, even though the harm may result indirectly in the loss of earnings to the shareholders. *Redmon*, 202 S.W.3d at 233. The individual shareholders have no separate and independent right of action for wrongs to the corporation that merely result in depreciation in the value of their stock. *Id.* As a result, to recover for wrongs done to the corporation, the shareholder must bring the suit derivatively in the name of the corporation so that each shareholder will be made whole if the corporation obtains compensation from the wrongdoer. *Id.* at 234. However, a corporate shareholder may have an individual action for wrongs done to him where the wrongdoer violates a duty that arises from a contract or otherwise and that is owed directly by the wrongdoer to the shareholder. Such a principle is not so much an exception to the general rule as it is a recognition that a shareholder may sue for violations of his individual rights regardless of whether the corporation also has a cause of action. It is the nature of the wrong whether directed against the corporation only or against the shareholder personally and not the existence of injury that determines who may sue. *Id.* The American Law Institute distinguishes between derivative actions and direct actions in the following way:

> [A] wrongful act that depletes corporate assets and thereby injures shareholders only indirectly, by reason of the prior injury to the corporation, should be seen as derivative in character; conversely, a wrongful act that is separate and distinct from any corporate injury, such as one that denies or interferes with the rightful incidents of share ownership, gives rise to a direct action.

Principles of Corporate Governance: Analysis and Recommendation § 7.01 cmt. c (2005).

■■■ In this cause, Swank and McCoy alleged claims in their individual capacities and in their derivative capacities on behalf of AMPS. Swank's and McCoy's claims in

---

3. When a party challenges jurisdiction by way of a plea to the jurisdiction and the determination of the jurisdictional issue involves an alleged factual dispute, "the trial court reviews the relevant evidence to determine if a fact issue exists," and the "summary judgment standard of proof" is used. *Kilpatrick*, 205 S.W.3d at 700 (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex.2004)).

this cause arose from (1) the jury's award in the underlying litigation of $35 million derivatively to Sverdlin on behalf of AMPS against Gardere Wynne and (2) the subsequent settlement of Sverdlin's derivative claim on behalf of AMPS against Gardere Wynne in which AMPS did not receive any of the settlement proceeds.

■ AMPS's claim for negligence against Gardere Wynne belonged to it and not to its shareholders. *Wingate,* 795 S.W.2d at 719; *Redmon,* 202 S.W.3d at 233. Swank's and McCoy's claims are based on an alleged injury to AMPS. They assert that, because of the negligence and wrongful conduct of the appellee lawyers, AMPS lost its $35 million jury verdict without receiving anything in return for the loss. Swank and McCoy alleged that the injury to AMPS caused injuries to them because they owned shares of stock in AMPS. However, a shareholder of a corporation who receives an indirect injury by reason of a prior injury to the corporation does not have standing to maintain an individual action for damages. *Redmon,* 202 S.W.3d at 233; Section 7.01 cmt. c. Because Swank's and McCoy's claims depend on an injury to AMPS, their claims are derivative in nature. Therefore, they lack standing to seek redress in their individual capacities. *Redmon,* 202 S.W.3d at 233.

■ We next address whether Swank and McCoy have standing to assert derivative claims on behalf of AMPS. The Cunningham Group presented evidence in support of its summary judgment ground that Swank and McCoy lacked standing to assert derivative claims on behalf of AMPS because they were never shareholders in AMPS. The Cunningham Group's evidence included excerpts from Swank's trial testimony in the underlying litigation, an affidavit of Swank that had been filed in the underlying litigation, and excerpts from

Swank's deposition in this cause. Swank's testimony and affidavit established the following facts: (1) that Sverdlin told Swank and McCoy that he would not recognize their stock options; (2) that Sverdlin repudiated the stock options before Swank and McCoy exercised their stock options; (3) that Swank exercised his stock option because Sverdlin had stated that he would not honor the stock option agreements; (4) that Sverdlin represented to Swank that he would refuse to honor the stock options; and (5) that Swank did not know whether Sverdlin ever endorsed a share certificate over to McCoy or him but that Swank believed that Sverdlin never endorsed a stock certificate over to him. Swank's appellate brief in the underlying litigation stated that, "[k]nowing that Sverdlin was trying to fire them, Swank and McCoy exercised their options on January 9, 1997." McCoy's appellate brief in the underlying litigation stated that he exercised his stock option on January 9, 1997. The Cunningham Group's summary judgment evidence established that Sverdlin repudiated the stock options before Swank and McCoy attempted to exercise them. The evidence was sufficient to disprove that Swank and McCoy were shareholders in AMPS; therefore, the summary judgment burden shifted to Swank and McCoy to come forward with evidence that precluded summary judgment. *City of Houston,* 589 S.W.2d at 678–79.

Swank and McCoy assert that, in the underlying litigation, the Houston First Court adjudicated them to be shareholders in AMPS. Swank and McCoy rely on two statements in the court's opinion. First, the court stated in the "Background" section that "Swank and McCoy exercised their stock options in AMPS." *See Swank,* 121 S.W.3d at 790. Second, the court stated, while analyzing Sverdlin's tortious interference claim, that "appellants had a

financial interest in AMPS, including stock, stock options, and loans." *Id.* at 801. We note that there were six appellants in the appeal in the underlying litigation. Based on these two statements, Swank and McCoy assert that the court "recognized that [they] were shareholders in AMPS."

In the underlying litigation, Sverdlin sought a declaratory judgment that he owned 100% of the stock in AMPS. Sverdlin did not submit a jury issue relating to his claim that he owned 100% of the stock, and Swank and McCoy did not submit jury issues relating to their claims that they each owned 20% of the stock. However, apparently based on the jury's finding that Swank, McCoy, and three of their codefendants had committed fraud against Sverdlin in connection with "the transaction involving his corporate stock," the trial court entered a declaratory judgment that Sverdlin owned 100% of the stock. The Houston First Court reversed the trial court's judgment and rendered judgment that Sverdlin and AMPS take nothing on their claims. *Swank,* 121 S.W.3d at 803. However, the court did not address the competing claims to ownership of AMPS's stock in its opinion, and the court did not render judgment that Swank and McCoy each owned 20% of the stock in AMPS.

■ A reversal of the trial court's declaration that Sverdlin owned 100% of the stock in AMPS is not the same as holding that Swank and McCoy each owned 20% of the stock in AMPS. The reversal of a trial court's judgment completely nullifies it, leaving it as if it had never been rendered other than as to further rights of appeal. *In re S.S.G.,* 208 S.W.3d 1, 3 (Tex.App.-Amarillo 2006, pet. denied); *Flowers v. Flowers,* 589 S.W.2d 746, 748 (Tex.Civ.App.-Dallas 1979, no writ); *King v. Cash,* 174 S.W.2d 503, 504 (Tex.Civ.App.-Eastland 1943, no writ).

The effect of a reversal of a judgment is to place the parties in the same position that they occupied before the judgment was rendered by the lower court. *City of Houston v. Walsh,* 27 Tex.Civ.App. 121, 66 S.W. 106, 108 (Tex.Civ.App.1901, writ ref'd); *cf. P.V. Int'l Corp. v. Turner, Mason, & Solomon,* 700 S.W.2d 21, 22 (Tex. App.-Dallas 1985, no writ) (the effect of setting aside a judgment is to place the parties in the position they occupied before the rendition of judgment). After the Houston First Court reversed the trial court's judgment in the underlying litigation, the parties were in the same position that they were in before the trial court rendered its judgment: Swank and McCoy had tried to exercise their stock options, and Sverdlin had refused to perform his part of the option contract. Swank and McCoy had a breach of contract action to establish that they were shareholders in AMPS.

Swank and McCoy also assert that they presented summary judgment evidence establishing that, after they exercised their stock options, Sverdlin agreed that he would honor their exercise of the options. Specifically, Swank and McCoy relied on minutes from a special meeting of AMPS's board of directors on January 9, 1997. David Jungman of Gardere Wynne, acting as secretary of the meeting, prepared the minutes. Jungman stated the following: "Mr. Swank notified the Board that he and James McCoy had exercised their options to purchase stock in [AMPS] from Mr. Sverdlin. Mr. Sverdlin said that he accepted the exercise of the options and that he would act pursuant to such notifications." Sverdlin's statement that he would act pursuant to the notifications was, at most, a promise to do something in the future. The fact that Sverdlin indicated that he would honor Swank's and McCoy's exercise of their stock options is no evi-

dence that he performed his part of the option contract. There was no summary judgment evidence that Sverdlin ever endorsed any stock over to Swank or McCoy.

Swank and McCoy's summary judgment evidence failed to raise a fact issue on whether they owned stock in AMPS. Therefore, Swank and McCoy lack standing to maintain this suit, and the trial court did not err in granting summary judgment to the Cunningham Group on the ground that Swank and McCoy lacked standing to assert derivative claims on behalf of AMPS. Swank's and McCoy's lack of standing also precludes them from maintaining their claims against the other appellees; therefore, the trial court did not err in granting summary judgment to all appellees based on the lack of standing.[4]

■ Even assuming that Swank and McCoy were shareholders in AMPS, they would lack standing in their individual capacities to assert claims belonging solely to AMPS. As explained above, Swank's and McCoy's claims are derivative in nature. Texas statutory law specifically provides for shareholder derivative proceedings in TEX. BUS. ORGS.CODE ANN. §§ 21.551–.563 (Vernon Pamph.2007), formerly TEX. BUS. CORP. ACT art. 5.14 (2003).[5] Sections 21.552 through 21.559 set forth a number of procedural requirements for maintain-

ing a derivative action, such as the requirement in Section 21.553 that a shareholder make a written demand on the corporation to take suitable action. Section 21.563 is entitled "Closely Held Corporation" and applies to corporations that have (1) fewer than thirty-five shareholders and (2) no shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association. Section 21.563(b) provides that the procedural requirements for maintaining derivative proceedings set forth in Sections 21.552 through 21.559 do not apply to closely held corporations. Section 21.563(c) provides as follows:

■ (c) If justice requires:

(1) a derivative proceeding brought by a shareholder of a closely held corporation may be treated by a court as a direct action brought by the shareholder for the shareholder's own benefit; and

(2) a recovery in a direct or derivative proceeding by a shareholder may be paid directly to the plaintiff or to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation.

Swank and McCoy argue that, pursuant to Section 21.563, they have standing in their

---

4. Appellees Smyser Kaplan, Beck Redden, Calvin Verner, and Battle Fowler did not move for summary judgment on the ground that Swank and McCoy lacked standing because they were not shareholders in AMPS. However, all appellees moved for summary judgment on the ground that Swank and McCoy lacked standing to assert claims belonging to AMPS in their individual capacities.

5. Swank and McCoy alleged in their pleadings in the trial court that they had standing to maintain AMPS's claims under the prior law found in Article 5.14 of the Texas Business Corporation Act. Section 21.563 of the Business Organizations Code made no sub-

stantive changes to Article 5.14(L) of the Texas Business Corporation Act. With the exception of filing fee requirements, the provisions of the Business Organizations Code do not apply until January 1, 2010, to entities formed before January 1, 2006, such as AMPS, unless the entities elect early adoption. *See* TEX. BUS. ORGS.CODE ANN. §§ 402.001–.005 (Vernon Pamph.2007). Whether or not AMPS elected early adoption of the Business Organizations Code, the analysis is the same because Section 21.563 made no substantive changes to Article 5.14(L). Therefore, we elect to address this issue under the current version of the statute.

individual capacities to assert derivative claims belonging to AMPS. Appellees argue that Section 21.563 merely removes the procedural requirements for maintaining a derivative action and, therefore, that Section 21.563 does not confer standing to Swank and McCoy in their individual capacities to assert claims belonging to AMPS. The plain language of the statute does more than remove the procedural requirements for maintaining a derivative action. Section 21.563(b) removes the procedural requirements, and then Section 21.563(c) further provides that the trial court may treat a derivative proceeding as a direct action by the shareholder for the shareholder's own benefit and may award a recovery in a derivative proceeding directly to the shareholder. Thus, under Section 21.563(c), the trial court has discretion to award damages in a derivative proceeding directly to the shareholder.[6] A trial court's decision to treat an action as a direct action under Section 21.563(c) so as to allow recovery to be paid directly to a shareholder plaintiff, as opposed to the corporation, does not mean that the action is no longer a derivative proceeding. *See DDH Aviation v. Holly,* No. Civ.A.3:02–CV–2598–P, 2005 WL 770595, *4 (N.D.Tex. 2005).

At oral argument before this court, Swank and McCoy relied on *Rogers v. Alexander,* 244 S.W.3d 370 (Tex.App.-Dallas 2007, no pet.). In *Rogers,* Daniel Alexander, Leslie Alexander, and Judith Pucci were the three shareholders in Alexander & Pucci, L.L.C. d/b/a Accent Home Health (Accent). *Id.* at 388. Daniel, Leslie, and Judith brought suit in their individual capacities seeking to recover damages to themselves and damages to Accent. The suit arose out of James Rogers's agreement to invest in Accent. Daniel, Leslie, and Judith alleged various claims against four defendants, including claims of fraud, theft, and breach of fiduciary duty against Rogers. At trial, Rogers's counsel raised an objection that Daniel, Leslie, and Judith lacked standing to assert claims for damages that belonged to Accent. *Id.* The trial court overruled the objection. *Id.* The jury awarded substantial damages to Daniel, Leslie, and Judith, and the trial court entered judgment in accordance with the jury's verdict. *Id.* at 380–81.

On appeal, the Dallas Court of Appeals addressed whether the trial court had erred in allowing Daniel, Leslie, and Judith to proceed with their suit under Article 5.14(L) of the Business Corporation Act (now Section 21.563(c) of the Business Organizations Code). In *Rogers,* the record showed that Accent's only shareholders were Daniel, Leslie, and Judith. *Rogers,* 244 S.W.3d at 388. Also, there was no evidence that Accent did not fall within the definition of a closely held corporation under Article 5.14(L). *Id.* Based on these two circumstances, the court concluded that the trial court had not erred in allowing the shareholders to proceed with the suit under Article 5.14(L). *Id.*

This case is distinguishable from *Rogers.* In *Rogers,* all three of the shareholders in the limited liability company brought the suit, and no disputes existed among the shareholders. In this case, Swank and

---

**6.** Section 21.563(c) is similar to Principles of Corporate Governance: Analysis and Recommendation § 7.01(d) (2005). Section 7.01(d) provides:

In the case of a closely held corporation [§ 1.06], the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

McCoy each claim to own 20% of the shares in AMPS. Even under this scenario, Sverdlin would own 60% of AMPS. To the extent that Swank and McCoy as shareholders in AMPS would be able to recover damages in this cause, Sverdlin (as a shareholder in AMPS) might also be able to recover damages. Section 21.563(c)(1) of the Business Organizations Code provides that, if justice requires, the trial court has discretion to treat a derivative proceeding brought by a shareholder of a closely held corporation as a direct action brought by the shareholder for the shareholder's own benefit. Section 21.563(c)(2) provides that, if justice requires, the trial court has discretion to allow the recovery in a derivative action to be paid (1) directly to the shareholder or (2) to the corporation if necessary to protect the interests of creditors or other shareholders. The record contains thousands of pages documenting the substantial and longstanding disputes that have existed between Swank and McCoy on the one hand and Sverdlin on the other hand. Under the circumstances in this cause, the trial court could reasonably have concluded (1) that justice did not require it to treat this suit as a direct action and (2) that it would have been necessary that any recovery be paid to AMPS to protect the interests of Sverdlin. Therefore, even if Sverdlin owned only 60% of the stock in AMPS, we conclude that the trial court did not abuse its discretion in refusing to allow Swank and McCoy to proceed with this cause in their individual capacities under Section 21.563(c).

◼ Swank and McCoy lack standing to assert derivative claims on behalf of AMPS against Beck Redden and Smyser Kaplan for an additional reason. After the jury issued its verdict in the underlying litigation, Beck Redden represented Swank and Smyser Kaplan represented McCoy. Beck Redden and Smyser Kaplan did not represent AMPS and, therefore, were never in privity with AMPS. Texas does not recognize a cause of action for legal malpractice asserted by a party not in privity with the offending attorney. *Barcelo v. Elliott,* 923 S.W.2d 575, 577–78 (Tex.1996); *Gamboa v. Shaw,* 956 S.W.2d 662, 664 (Tex.App.-San Antonio 1997, no pet.). Because no privity existed between AMPS and Beck Redden or Smyser Kaplan, AMPS had no claim for legal malpractice against Beck Redden and Smyser Kaplan.

◼ Similarly, AMPS's lack of privity with Beck Redden and Smyser Kaplan precludes it from asserting breach of fiduciary duty claims against them. Fiduciary duties arise when an attorney-client relationship is created. *Meyer v. Cathey,* 167 S.W.3d 327, 330 (Tex.2005); *Greene's Pressure Treating & Rentals, Inc. v. Fulbright & Jaworski, L.L.P.,* 178 S.W.3d 40, 43 (Tex.App.-Houston [1st Dist.] 2005, no pet.). An attorney-client relationship did not exist between Beck Redden or Smyser Kaplan and AMPS. In the absence of an attorney-client relationship, Beck Redden and Smyser Kaplan did not owe fiduciary duties to AMPS, and AMPS could not recover on a breach of fiduciary duty claim against them.

AMPS had no claim for legal malpractice or breach of fiduciary duty against Beck Redden and Smyser Kaplan. Therefore, Swank and McCoy lack standing to assert derivative claims on behalf of AMPS against Beck Redden and Smyser Kaplan.

For the reasons stated above, Swank and McCoy lack standing to assert claims belonging to AMPS in their individual capacities, and they also lack standing to assert derivative claims on behalf of AMPS. Based on Swank's and McCoy's lack of standing, the trial court did not err

in granting summary judgment to appellees.

### Causation and Damages

 Appellees moved for traditional summary judgments on the ground that Swank's and McCoy's causation and damages theories were fatally speculative as a matter of law. To prevail on a legal malpractice claim, a plaintiff must show (1) that the attorney owed the plaintiff a duty, (2) that the attorney breached that duty, (3) that the breach proximately caused the plaintiff's injuries, and (4) that damages occurred. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex.2004). On a breach of fiduciary duty claim, while a plaintiff need not prove causation to recover disgorgement of fees, the plaintiff must prove causation to recover actual damages. *Hoover v. Larkin*, 196 S.W.3d 227, 233 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

 The causal nexus requirement is met when a jury is presented with pleading and proof that establishes a direct causal link between the damages awarded, the actions of the defendant, and the injury suffered. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex.1995); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 774 (Tex.App.-Houston [1st Dist.] 2004, no pet.). Proximate cause consists of two elements: (1) cause in fact and (2) foreseeability. *Western Inv., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex.2005). These elements cannot be established by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003).

 A party cannot recover damages that are based on speculation or conjecture. *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 482 (Tex.App.-Fort Worth 2004, no pet.). Uncertainty as to the fact of legal damages is fatal to recovery. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985). Thus, if damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997). When damages are based on "speculation upon speculation," summary judgment is appropriate. *Reardon v. LightPath Techs., Inc.*, 183 S.W.3d 429, 439 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

 Swank and McCoy alleged that the Gardere Wynne settlement resulted in damages to them. Swank and McCoy identified their damage theories in their answers to interrogatories. Swank stated that he sought to recover the following damages:

a. Mark Swank['s] damages consist of 20% of the $35 million AMPS jury verdict, or $7 million.

or,

b. Anatoly Sverdlin settled his $24 million jury verdict for $20 million, with the settlement value equaling about 81% of the Jury Verdict. 81% of AMPS'[s] $35 million Jury Verdict would have an approximate settlement value of $28.35 million. Mark Swank's 20% interest in the AMPS'[s] settlement would therefore have a value of $5.76 million.

or[,]

c. The $20 million Gardere Wynne settlement settled both the Anatoly Sverdlin $24.5 million jury verdict and the AMPS'[s] $35 million Jury Verdict. AMPS['s] proportionate share of the settlement would be 58.8% or approximately $11.76 million. Mark Swank's 20%

shareholder interest in AMPS would have an approximate value of $2.35 million.

McCoy stated that he sought to recover the following damages:

Mr. Sverdlin received $20,000,000 in January 1999 for his $24,500,000 verdict against Gardere Wynne. This represents a recovery by Mr. Sverdlin of 82% of his damages against Gardere Wynne. Applying the same percentage of recovery against the $35,000,000 verdict that AMPS received would result in AMPS receiving $28,700,000. It is [McCoy's] position that Mr. Sverdlin should separately forfeit his ill-gotten gain from breaching his fiduciary duty to AMPS. When Mr. Sverdlin's ill-gotten gain of $20,000,000 is added to the value of AMPS'[s] verdict against Gardere Wynne, the resulting figure is $48,700,000.

. . . .

In the alternative and not by way of limitation, [McCoy] seeks the proceeds of the Gardere settlement which should have been allocated, at an absolute minimum, on the basis of AMPS'[s] and Sverdlin's respective recoveries against Gardere Wynne. Mr. Sverdlin received a $24,500,000 verdict against Gardere Wynne. AMPS received [a] $35,000,000 verdict against Gardere Wynne. Accordingly, the minimum AMPS should have received was 59% of the proceeds of the Gardere settlement. Moreover, as soon as Mr. Sverdlin attempted to usurp all of the benefits of the Gardere settlement for his own benefit, which occurred before the settlement was funded, the entire $20,000,000 should have gone to the benefit of AMPS.

Swank and McCoy presented affidavits from Vincent Lee Marable, III, an attorney, in response to appellees' motions for summary judgment. Marable stated that the distribution of the entire $20 million in settlement proceeds directly to Sverdlin was not fair to AMPS or to Swank and McCoy. He also stated that appellees had breached applicable standards of care. Marable also provided "causation" opinions in the affidavits. He stated that the applicable standard of care required Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan to object at the fairness hearing and that, had these appellees adhered to the applicable standard of care, "the disbursement of the $20,000,000.00 settlement funds directly to Sverdlin individually would have been stopped and AMPS'[s] and McCoy's and Swank's rights with respect to the settlement funds would have been preserved." Marable also stated that, "had the Cunningham Group adhered to the standard of care by taking steps to prevent the loss of AMPS'[s] jury verdicts, AMPS'[s] causes of action, and AMPS'[s] assets, AMPS'[s] (and McCoy's and Swank's) rights with respect to the settlement funds, proceeds, and property, would have been preserved."

The summary judgment evidence established the following: (1) that, before the trial of the underlying litigation, Sverdlin did not plead a derivative claim on behalf of AMPS for malpractice against Gardere Wynne; (2) that Sverdlin's counsel, Lloyd Cunningham, did not believe that Gardere Wynne had committed negligence against AMPS; and (3) that Sverdlin did not present any expert testimony on the issue of whether Gardere Wynne had committed negligence against AMPS. However, the trial court submitted a jury question asking whether Gardere Wynne had committed negligence against AMPS. The jury awarded the total of $35 million to AMPS based on the malpractice findings. Sverdlin's counsel, Lloyd Cunningham, then filed a trial amendment adding a malpractice claim by AMPS against Gardere Wynne.

Later, Cunningham sought to withdraw the trial amendment because he believed that there was no evidence to support the jury's finding that Gardere Wynne had committed negligence against AMPS. Cunningham explained in his deposition in this cause that the Cunningham Group did not pursue a negligence claim on behalf of AMPS against Gardere Wynne because "[he] honestly didn't see support for that in any of the evidence that [he] had prior to trial." He further explained:

> During trial we didn't pursue a claim for negligence against Gardere, Wynne because we hadn't prepared ourselves for that. In fact, we didn't have an expert that testified as to the failure of Gardere, Wynne to meet the standard of care that was necessary to have as a predecessor to a malpractice claim. We had an expert that testified that they failed to meet the standard of care with regard to Sverdlin, but we didn't have that same testimony or similar testimony on behalf of a claim that AMPS might have for negligence.

The summary judgment record supports Cunningham's conclusion because, in the absence of expert testimony that Gardere Wynne had committed negligence against AMPS, there was no evidence to support the jury's finding. *See F.W. Indus., Inc. v. McKeehan*, 198 S.W.3d 217, 221 (Tex.App.-Eastland 2005, no pet.) (causation in a legal malpractice suit must be proved by expert testimony unless causation is within the jury's common understanding); *Zenith Star Ins. Co. v. Wilkerson*, 150 S.W.3d 525, 530 (Tex.App.-Austin 2004, no pet.) (expert testimony of an attorney is usually necessary to establish the standard of skill and care ordinarily exercised by an attorney). Given the complex nature of the issues involved in the underlying litigation, expert testimony would have been necessary to establish the standard of care and causation with respect to a malpractice claim

by AMPS against Gardere Wynne. Additionally, the trial court stated at the fairness hearing "that Mr. Sverdlin's individual malpractice claims would have been the only claims to—to survive the verdict against Gardere Wynne."

Nonetheless, Swank and McCoy assert that AMPS was damaged because it did not share in the Gardere Wynne settlement proceeds. At a hearing on January 13, 1999, the trial court in the underlying litigation considered the Gardere Wynne settlement. At that hearing, Cunningham announced the terms of the settlement agreement. He stated that Gardere Wynne would be making a $20 million payment "in consideration for which we are dismissing request for a trial amendment we had on behalf of AMPS and we are asking the Court to enter a take nothing judgment." Cunningham also stated that Sverdlin would be receiving the $20 million settlement proceeds in his individual capacity and that none of the proceeds would be going to AMPS. Counsel for some of the defendants stated that it was necessary to hold a fairness hearing to determine whether it was fair to AMPS for Sverdlin to take the settlement proceeds and not give any of the proceeds to AMPS. After hearing arguments from counsel, the trial court stated as follows:

> Okay. And there was a dispute as to whether or not the options had been properly exercised and used and whether or not he was the sole shareholder or whether or not those options were effective and somebody else was entitled to them. Okay?

> We had a 6–week long trial, heard all the evidence, the jury came back and found in favor of the plaintiff. Okay.

> Now, is it fair for Mr. Sverdlin to receive the settlement funds that have been offered in the settlement agree-

ment by Gardere Wynne individually or should AMPS and the very individuals that the jury has found whose conduct was egregious in violation of their fiduciary duties, should they benefit from some of those settlement funds? That's the question, isn't it?

The trial court then stated that it would approve the settlement agreement and the allocation set forth in the agreement and that a fairness hearing would be held in the future. On January 13, 1999, the trial court entered a judgment as to Gardere Wynne. In the judgment, the trial court (1) denied the trial amendment relating to AMPS's malpractice claims against Gardere Wynne, (2) approved the Gardere Wynne settlement agreement, (3) set aside the jury's answers relating to the conduct of Gardere Wynne, and (4) adjudged that Sverdlin take nothing by his claims against Gardere Wynne.

 On January 25, 1999, the trial court conducted the fairness hearing. After hearing comments from Cunningham, the trial court stated that Sverdlin's individual malpractice claims would have been the only claims to survive the verdict against Gardere Wynne. Counsel for the defendants in the underlying litigation did not make any objections to the settlement. The trial court found that the settlement agreement between Sverdlin and Gardere Wynne met "all the requirements of substantial fairness to the corporation." We note that AMPS's receiver did not object to the settlement and that AMPS's board of directors ratified the settlement.[7]

Swank and McCoy assert that the Cunningham Group should not have withdrawn the trial amendment and that the other appellees should have objected to the Gardere Wynne settlement. Attempting to determine what would have happened-had the Cunningham Group not withdrawn the trial amendment or had the other appellees objected to the settlement-involves uncertainty and pure speculation. For example, a failure to withdraw the trial amendment and any objection to the settlement must be considered in light of the following facts: (1) based on the jury's findings, the trial court declared that Sverdlin owned 100% of the stock in AMPS; (2) grounds did not exist to support an allocation of the settlement proceeds to AMPS because there was no evidence to support the jury's malpractice finding in AMPS's favor against Gardere Wynne; (3) the trial court's statement at the fairness hearing that only Sverdlin's individual malpractice claims against Gardere Wynne would have survived the verdict; and (4) the trial court's framing of the issue at the January 13, 1999 hearing-"[S]hould AMPS and the very individuals that the jury has found whose conduct was egregious in violation of their fiduciary duties, should they benefit from some of those settlement funds?" Given these facts, it is highly speculative to assume

---

7. Appellees moved for summary judgment on the ground that AMPS's board ratified the settlement agreement. Ratification is an affirmative defense. *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980). As such, appellees had the summary judgment burden of establishing ratification as a matter of law. *Am. Tobacco Co.,* 951 S.W.2d at 425. A challenged transaction found to be unfair to the corporate enterprise may nonetheless be upheld if ratified by a majority of disinterested directors or the ma-

jority of the stockholders. *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 720 (5th Cir.1984) (applying Texas law). While appellees did present summary judgment evidence establishing that AMPS's board ratified the settlement, they did not present any summary judgment evidence establishing that the directors who ratified the settlement were "disinterested." Therefore, appellees failed to meet their summary judgment burden of establishing ratification as a matter of law.

that the trial court would have sustained any objection to the settlement or awarded any of the settlement proceeds to AMPS.

■ Swank and McCoy did not present any summary judgment evidence establishing that a reasonable or valid objection could have been made to the Gardere Wynne settlement or that the trial court would have been required to grant such an objection. Swank's and McCoy's expert, Marable, stated that, had appellees adhered to applicable standards of care, "the disbursement of the $20,000,000.00 settlement funds ... would have been stopped." Marable's affidavits failed to raise a fact issue on causation and damages for at least two reasons. First, the statement that the disbursement of the settlement funds would have been stopped is mere speculation and conclusory. Marable did not provide any facts in his affidavit in support of his claim that the trial court would have stopped the disbursement of the settlement proceeds. Conclusory statements by an expert are insufficient to support or defeat summary judgment. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997). Second, Marable did not state any facts supporting a conclusion (1) that grounds existed for objecting to the settlement or (2) that grounds existed for awarding a portion of the settlement proceeds to AMPS. Swank and McCoy offered no summary judgment evidence showing that the complained-of conduct of appellees caused any damage to AMPS.

Swank's and McCoy's claims that they were damaged by AMPS's failure to recover part of the proceeds from the Gardere Wynne settlement is based on "speculation upon speculation." To support their damages claims, Swank and McCoy would be required to speculate on the following issues, among others: (1) Would the trial court have considered any objection to the Gardere Wynne settlement in light of the facts (a) that no evidence supported the jury's malpractice finding in favor of AMPS against Gardere Wynne, (b) that, based on the jury's findings, the trial court had determined that Sverdlin owned 100% of the stock in AMPS, and (c) that, based on the jury's findings, the trial court considered Swank, McCoy, and the other defendants to be wrongdoers?; (2) Would the trial court have sustained an objection to the settlement agreement and refused to approve the settlement unless some of the proceeds were allocated to AMPS?; (3) Would Sverdlin have gone through with the settlement if the trial court had allocated a portion of the proceeds to AMPS?; (4) Assuming that the trial court allocated part of the proceeds to AMPS and that AMPS received the proceeds, would AMPS have distributed some part of the proceeds to its shareholders, as opposed to, for example, paying off its creditors or investing the proceeds in the further development of the FCIS system?; and (5) Could Swank and McCoy establish that they were in fact owners of 20% of the shares in AMPS?

Likewise, Swank's and McCoy's alternative claim that they were damaged by AMPS's failure to recover on its jury verdict against Gardere Wynne is based on "speculation upon speculation." Their alternative damages theory is based on a number of speculations, including the following: (1) that the Gardere Wynne settlement, which required a release of AMPS's claims, would have failed for some reason; (2) that the trial court would have upheld AMPS's $35 million verdict against Gardere Wynne even though (a) the trial court had denied AMPS's trial amendment, (b) there was no evidence to support the jury's malpractice finding in favor of AMPS against Gardere Wynne, and (c) the trial court stated that only Sverdlin's individual malpractice claims against AMPS would have survived the verdict; (3) that, if the trial court had entered judgment in the amount of $35 million in favor of AMPS

against Gardere Wynne, the court of appeals would not have reversed the judgment even though the court of appeals reversed the trial court's judgment in all respects as to the non-settling defendants, concluding that Sverdlin's damages models were not supported by the evidence; (4) that, if the court of appeals upheld the judgment, AMPS would have recovered some amount of money from Gardere Wynne; (5) that, assuming that AMPS recovered some amount, AMPS would have distributed some part of the proceeds to its shareholders as opposed to (for example) paying off its creditors or investing the proceeds in the further development of the FCIS system; and (6) that Swank and McCoy could establish that they each owned 20% of the shares of stock in AMPS.

Swank's and McCoy's claims that they were damaged as a result of AMPS's failure to share in the proceeds of the Gardere Wynne settlement or AMPS's failure to recover on its jury verdict against Gardere Wynne are based on the above series of speculations. The alleged damages may not be recovered because they are "too remote, too uncertain, or purely conjectural." *See Arthur Andersen,* 945 S.W.2d at 816.[8]

Because Swank's and McCoy's causation and damages theories were fatally speculative, the trial court did not err in granting (1) traditional summary judgments to the Cunningham Group on Swank's and McCoy's breach of fiduciary duty claims and to Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan on Swank's and McCoy's breach of fiduciary duty and negligence claims. For the same reasons, the trial court did not err in granting summary judgment to the Cunningham Group on Swank's and McCoy's conversion claims; to Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan on Swank's and McCoy's conspiracy claims; and to Lloyd Cunningham on Swank's and McCoy's fraud claims.[9] Additionally, because Swank and McCoy failed to produce more than a scintilla of probative evidence to raise a genuine issue of material fact on their damage claims, the trial court did not err in granting no-evidence summary judgments to Calvin Verner and Battle Fowler on Swank's and McCoy's breach of fiduciary duty, negligence, and conspiracy claims.

### Claims for Disgorgement of Fees

■ A client need not prove actual damages to obtain forfeiture of an attor-

---

**8.** We note that the trial court granted special exceptions requiring Swank and McCoy to plead facts and legal theories supporting their claims for damages. Swank's and McCoy's counsel approved as to form and substance the trial court's agreed order on special exceptions. While Swank and McCoy amended their petition after the trial court granted the special exceptions, they did not change their damage theories.

**9.** Swank and McCoy alleged that appellees breached their duties in connection with "the application of the credit [that the Gardere Wynne] settlement proceeds allowed." Swank and McCoy did not allege how they were damaged by the manner in which the settlement credit was allocated among the defendants in the underlying litigation. In

fact, Swank and McCoy were not damaged by the allocation of the settlement credit. As a result of the court of appeals's judgment in the underlying litigation, neither Swank nor McCoy owed any damages to Sverdlin or AMPS. Thus, the issue of whether Swank and McCoy were entitled to receive credit for the Gardere Wynne settlement was immaterial. Swank and McCoy also alleged that the Cunningham Group breached its fiduciary duty to AMPS by allowing the proceeds from the Gardere Wynne settlement to be used as a settlement credit to offset the amount awarded to AMPS on its breach of fiduciary duty claims. AMPS was not damaged by the offset because the court of appeals rendered judgment that AMPS take nothing by its claims.

ney's fee for the attorney's breach of fiduciary duty to the client. *Burrow v. Arce,* 997 S.W.2d 229, 240 (Tex.1999). In *Burrow,* the Texas Supreme Court cited the proposed RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 49 (Proposed Final Draft No. 1, 1996), which provided that "[a] lawyer engaging in clear and serious violation of a duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter." [10] *Id.* at 241. The fee forfeiture remedy is based on two ideas. First, a client does not receive the benefit of the bargain if the attorney breaches fiduciary duties owed to the client. Second, fee forfeiture is a deterrent to an attorney breaching fiduciary duties to a client. *Id.* at 237–38. In some fee forfeiture cases, denying an attorney all compensation would be an excessive sanction because it would give a windfall to the client. *Id.* at 241–42.

 Swank and McCoy seek forfeiture of all fees received by Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan in their representation of Swank and McCoy. Swank and McCoy also seek forfeiture of all fees received by the Cunningham Group in its representation of AMPS. The record demonstrates that Swank and McCoy did not pay any legal fees to Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan. Instead, LDNGH (a codefendant in the underlying litigation) paid Calvin Verner's and Battle Fowler's fees relating to their representation of Swank and McCoy. LDNGH initially paid Beck Redden's and Smyser Kaplan's fees relating to their representation of Swank and McCoy. Later, Smyser Kaplan's fees relating to its representation of McCoy were the subject of a contingency fee agreement. Swank and McCoy did not pay any legal fees to the Cunningham Group in connection with its representation of AMPS.

Because Swank and McCoy did not pay any legal fees to the appellee lawyers, allowing Swank and McCoy to recover them as a fee forfeiture would result in a windfall to them. Equity does not support such a "windfall" result; therefore, fee forfeiture is not an appropriate remedy in this cause. *Cf. Tener v. Bracewell,* No. 14–00–00442–CV, 2002 WL 15937, *2 (Tex. App.-Houston [14th Dist.] Jan. 3, 2002, no pet.) (not designated for publication) (allowing a client, rather than the insurer that actually paid the legal fees, to recover the fees from the attorney "would not be compensation but a windfall").[11] The trial

---

10. For current Restatement provision, *see* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 37 (2000).

11. Some of the appellees cite *Liberty Mut. Ins. Co. v. Gardere & Wynne, L.L.P.,* 82 Fed.Appx. 116, 117–21 (5th Cir.2003) (not designated for publication); *Bell v. Phillips,* No. 14–00–01189–CV, 2002 WL 576036 (Tex.App.-Houston [14th Dist.] Apr. 18, 2002, no pet.) (not designated for publication); and *Universal Fleet Leasing, Inc. v. Pope,* No. 01–99–01235–CV, 2000 WL 1708515 (Tex.App.-Houston [1st Dist.] Nov. 16, 2000, pet. denied) (not designated for publication), in support of the argument that Swank and McCoy are not entitled to fee forfeiture. Those cases did not involve the precise issue that is before us in this cause. In *Liberty Mutual,* a client did not

seek to recover fees that it had paid to its law firm. Rather, the client sought to recover fees that its former law firm had earned in representing an opponent in a suit, and the fees had been paid by the opponent. The *Liberty Mutual* court held that the trial court had not erred in refusing to allow the client to recover fees paid by other clients. *Liberty Mutual,* 82 Fed.Appx. at 121. In *Phillips,* an attorney was retained on a contingency fee agreement, and the attorney was never paid any fees during his representation of the client. The court held that, because the attorney had not been paid any fees, the client did not have a claim for fee forfeiture. *Phillips,* 2002 WL 576036 at *8 n. 3. In *Pope,* the client claimed that he had paid "over $25,000.00 in attorneys fees" to his attorneys. However, the client failed to present any evidence that

court did not err in granting summary judgment to appellees on Swank's and McCoy's fee forfeiture claims.

### Conclusion

For the reasons set forth above, the trial court properly granted summary judgment to appellees on the following grounds: (1) that Swank and McCoy lack standing to assert their claims; (2) that Swank's and McCoy's causation and damages theories are fatally speculative; and (3) that Swank and McCoy are not entitled to fee disgorgement. Because summary judgment was proper on these grounds, we need not address the merits of the other summary judgment grounds advanced by appellees. We overrule Swank's and McCoy's appellate issues.

### This Court's Ruling

We affirm the judgment of the trial court.

he had paid any fees in connection with the matter at issue. Therefore, the court held that the client had produced no evidence showing that he was entitled "to a disgorgement of fees paid in connection with this matter." *Pope*, 2000 WL 1708515 at *3. This cause is distinguishable from *Liberty Mutual*, *Phillips*, and *Pope* because, in this cause, four of the appellee law firms received fees, albeit from another party, in connection with their representation of Swank and McCoy.