

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00464-CV

DARRELL LAKE, RIAN MAGUIRE,
RCC MEDICAL #1 GENPAR, LLC,
AND REALTY CAPITAL CORP.
AND
RICHARD MYERS AND REALTY
CAPITAL PARTNERS, LLC

APPELLANTS

V.

GEORGE F. CRAVENS, M.D., RCC
MEDICAL DISTRICT FACILITIES,
LTD., AND CENTER FOR
NEUROLOGICAL DISORDERS
HOSPITAL, LP

APPELLEES

----------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 352-242125-09

----------

## OPINION

----------

## I. INTRODUCTION

Appellees George F. Cravens, M.D. and RCC Medical District Facilities, Ltd. (the Partnership) filed this suit for damages against the appellants following failed efforts to develop and build a physician-owned neurosurgical hospital in Fort Worth. There are two groups of appellants. Appellants Realty Capital Corporation (RCC), RCC Medical #1 GenPar, LLC (RCC GenPar), Darrell Lake, and Rian Maguire (collectively, the RCC Appellants) assert nine issues that include challenges to Cravens's standing to assert claims and recover damages in his individual capacity, the legal and factual sufficiency of the evidence to support Cravens's claims and attorney's fees awards, the admissibility of expert testimony, alleged duplicitous damage awards, and the trial court's denial of contractual indemnification for Maguire. Appellants Realty Capital Partners, LLC (RCP) and Richard Myers (collectively, the RCP Appellants) contend in six issues that Cravens does not have standing in his individual capacity, that the evidence is legally and factually insufficient to support the jury's liability and damage findings, that Cravens's expert witness should not have been allowed to testify about lost profits, that Cravens ratified the parties' partnership agreement, and that Cravens should not recover attorney's fees. We reverse and remand.[1]

---

[1]This cause was assigned to the author on February 26, 2015.

## II. BACKGROUND

The parties hotly contested virtually all factual matters at trial. This background section does not purport to address all of those factual disputes and is instead designed only to provide context for our holdings.

### A.  Events Preceding Partnership

Cravens, a medical doctor, practices neurological surgery in Fort Worth as a member and as the president of Center for Neurological Disorders, P.A. (CND). Appellant RCC is a real estate development company. Appellants Maguire and Lake are both former officers of RCC. Appellant RCP is a private equity investment company. Appellant Myers is a real estate developer and is the chief executive of both RCC and RCP.

For many years, Cravens envisioned building, owning, and operating a physician-owned neurosurgical hospital, and he met with various individuals over several years to identify developers, contractors, hospital operators, and potential investors for the proposed hospital. In May 2007, Cravens met with Rory Maguire,[2] an employee of Appellant RCP, to discuss the potential hospital project. Rory Maguire presented Cravens with a non-binding letter of intent that generally outlined the potential project, but Cravens never signed the letter of intent. This initial letter of intent listed "Cravens or affiliate" as the hospital developer and listed the general partner as a "newly formed single asset entity

---

[2]Rory Maguire is Appellant Rian Maguire's brother. Rory Maguire is not a party to this appeal.

3

controlled by or owned by the Developer."  A September 17, 2007 letter of intent contained similar provisions, but it was also not signed.

Later in 2007, Rory Maguire introduced Cravens to Lake as a potential developer for the project.  After further discussion, RCC provided Cravens with another letter of intent that Cravens signed in November 2007.  The executed letter of intent listed RCC as the developer and listed Cravens as a Class A limited partner.  It also included a provision allowing Cravens to purchase the hospital after it had been constructed and was in operation.  Cravens testified that he would contribute his "land and medical office practice building into this partnership in order to do this deal" but that the option to purchase the hospital after construction would allow him to eventually get the land back.

Although Cravens repeatedly referred to the property on which the proposed hospital would be built as "[his] land," Cravens did not actually own the property, and he admitted as much during his testimony.  The property was actually owned by Willmar Investments, Ltd. (Willmar).  Willmar is a limited partnership that Cravens had previously created to own and hold property in trust for his children.  Willmar owned one asset:  the real property on Summit Avenue in Fort Worth where CND, the physician group to which Cravens belonged, housed its medical practice (the property).  The property had an approximate value of $4,870,000.

4

## B.     Partnership Agreement and Other Contemporaneous Contracts

In late 2007, Cravens and RCC began negotiating the terms of the limited partnership agreement (the Partnership Agreement) that had been contemplated by the executed letter of intent. All parties were represented by separate legal counsel in the negotiations.

The parties formed the Partnership by executing the Partnership Agreement effective February 15, 2008. Under the Partnership Agreement, Appellant RCC GenPar became the general partner of the Partnership, and Cravens became the majority Class A limited partner with a 99.8% limited partnership interest. The parties valued Cravens's 99.8% interest at $3,320,000, based on Willmar's conveyance of the property to the Partnership, which they counted as Cravens's initial capital contribution.

Willmar's conveyance of the real property was governed by a property contribution agreement that the Partnership and Willmar executed the same day that the parties created the Partnership.[3] The property contribution agreement required that at the closing, the Partnership pay off the approximate $1.6 million lien against the property. In essence, the $3,320,000 value of Cravens's limited partnership interest in the Partnership was determined by subtracting the approximate $1.6 million debt on the property from the property's $4,870,000 total value. The Partnership Agreement provided that title to any property

---

[3]Cravens signed the property contribution agreement on Willmar's behalf in his capacity as general partner of Willmar.

conveyed to the Partnership would be "taken in the name of, retained and held by the Partnership."

The Partnership Agreement also contemplated the addition of several Class B limited partners that would own a total of 0.1% of the Partnership. RCC GenPar, the general partner, owned the remaining 0.1%. As the Class A limited partner, Cravens would receive 99.8% of the Partnership's profits until his $3,320,000 initial contribution plus 10% annual interest had been repaid. Afterward, Cravens would receive 50% of future profits, the Class B limited partners would collectively receive 49%, and RCC GenPar would receive the remaining 1%. Myers testified that the Class B limited partners thus stood to profit from the completion and sale of the hospital but that he doubted the Class B limited partners would profit if the hospital were never built.

The Partnership Agreement named RCC as the developer for the project and provided for the acquisition of an interim loan "of approximately $3,100,000.00 [to be] incurred by the Partnership concurrently with the contribution of the Property to the Partnership [and to be used] to replace the indebtedness encumbering the Property and pay for certain development and pre-construction expenses." The Partnership Agreement also contemplated a construction loan for the proposed hospital and stated that the debt-to-equity ratio for any construction loan would be at least 80% debt with no more than 20% equity. In addition, the Partnership Agreement capped the total project cost at

$28 million. Cravens testified that he wanted these limitations so that he would be able to individually purchase the hospital once it was built and operational.

The parties executed several other agreements contemporaneously with the Partnership Agreement. As mentioned above, the Partnership and Willmar entered into a property contribution agreement that required Willmar to convey the property into the Partnership. The Partnership and the Center for Neurological Disorders Hospital, L.P. (CNDH) entered into a twenty-year lease of the existing office space and the future hospital building that required CNDH to pay monthly rent to the Partnership.[4] In addition, Cravens and the Partnership entered into an option contract that granted Cravens a one-time option to purchase the hospital from the Partnership once the hospital was completed and operational for thirteen months. Finally, the parties signed a letter agreement that suspended certain deadlines so that RCC could pursue the purchase of adjacent property to build a parking garage for the proposed hospital. Although the owner of the adjacent property ultimately declined to sell, the Partnership later entered into a lease of the adjacent property. That lease contract was negotiated in 2008 and was signed as effective in January 2009.

C. Interim Loan Funded and Property Contributed by Willmar

Willmar contributed the property to the Partnership on October 1, 2008. Near the same time, the Partnership obtained a $3.1 million interim loan from NorthStar Bank. From the proceeds of the interim loan, the Partnership paid off

---

[4]CNDH, L.P. is a different entity than CND.

the approximate $1.6 million in liens against the property and Cravens received $484,429.59 as reimbursement for his previous development expenses.[5] After the payments to lenders and Cravens, the Partnership had about $1 million left to use for development expenses. Thus, once the interim loan had been secured and Willmar had conveyed the property to the Partnership, title to the property was held in the name of the Partnership (in which Cravens held a 99.8% limited partnership interest) and the original $1.6 million in debt against the property had been paid by the Partnership from the $3.1 million interim loan proceeds. But the $1.6 million in debt against the property had been replaced by a $3.1 million debt, with the Partnership and RCC GenPar being responsible for the note instead of Willmar. CNDH then began paying monthly rent to the Partnership for use of the property.

### D. Construction Loan Never Approved

The parties intensely dispute the quality, quantity, and necessity of Appellants' subsequent efforts to raise equity, secure financing, and procure construction drawings for the proposed hospital and their representations about those efforts. Cravens presented evidence that Appellants did virtually nothing productive while representing to him that they were working feverishly. Appellants, on the other hand, presented evidence describing their efforts to obtain initial construction designs, raise equity, and secure financing.

---

[5]Throughout the trial, the parties and witnesses referred to the $484,429.59 as $500,000, and we do the same.

8

Regardless, the Partnership began negotiations for a construction loan with IronStone Bank (IronStone) in late June and early July 2009. By August 2009, IronStone had provided the Partnership with a term sheet for the construction loan.

Cravens presented evidence that through September and October 2009, Appellants repeatedly assured him that bank approval was imminent or had occurred but that IronStone never actually approved a loan or provided a schedule for approval. Cravens testified that he learned at a meeting with IronStone representatives in October that they did not understand the loan application, specifically that they did not grasp the difference between physician fees and hospital fees that would be generated once the hospital was operational and that they thought that the projected revenue numbers were inflated by including both as separate income.[6] About a week later, Appellants received a credit memo from IronStone, but the memo indicated that the bank had additional concerns and still did not understand the Partnership's projected revenue. Based on those concerns, IronStone asked for limited guaranties from the physicians who would practice medicine at the hospital. IronStone also sought three years of tax returns from the guarantors and more information from Cravens about Willmar and other trusts listed on Cravens's financial statement

---

[6]Cravens explained during his testimony that physician fees are those charged by the physicians for their services to the patients, such as performing an operation at the hospital, and that the hospital fees are institutional fees for things like "use of the operating room, the nursing staff, the ICUs, the hospital beds, medications[,] and so forth."

9

so that the loan underwriting process could continue. Cravens was willing to provide the guaranties but not the other information, and he decided not to provide it.

### E. General Partner Removed

On November 6, 2009, Cravens, exercising his voting share as the 99.8% limited partner, voted to remove RCC GenPar as the general partner of the Partnership and to replace it with Willmar.[7] The notice to Myers and Lake of Cravens's vote stated that the "removal was for fraudulent activities." Cravens further explained his reasoning in a letter to Myers and Lake dated November 13, 2009, writing among other things that he had been given "misleading information and ultimately fraudulent information regarding the bank funding and the level of review and the timing of the closing of the loan," that a bank representative had told him that the loan had been declined over six weeks earlier, and that Myers and Lake had failed to comply with the Partnership Agreement and had "caused material detriment to the [P]artnership." Cravens subsequently replaced Willmar with himself as general partner and still later named an entity called Center for Neurological Disorders, General Partner, LLC as general partner.

### F. Cravens and Others Filed Suit

Cravens, the Partnership, Willmar, and CNDH sued Appellants, seeking damages and attorney's fees and alleging causes of action for common law and

---

[7]The parties disputed at trial whether Cravens properly removed RCC GenPar as the general partner of the Partnership.

10

statutory fraud, negligent misrepresentation, securities law violations, aiding and abetting, conspiracy, promissory estoppel, and unjust enrichment. Willmar nonsuited its claims prior to trial. The clerk's record also includes an order granting partial summary judgment for Appellants and dismissing all of Willmar's and CNDH's claims with prejudice.[8] At the time of trial, Cravens and the Partnership were the only plaintiffs.

### G. Trial and Final Judgment

The case was called for trial on April 13, 2011. In addition to the evidence discussed generally above, Cravens presented expert testimony that Appellants improperly guided the project by spending almost $1 million on construction drawings that could not be used and by incurring debt on the property that had to be repaid. Another expert testified that Cravens would have received $893,052 in past profits and more than $19 million in future profits if the hospital had been built and operated for twenty years and if Cravens had exercised his option to purchase the hospital from the Partnership.

After hearing several weeks of testimony, the trial court submitted the case to the jury in a charge with forty-eight questions. The jury returned a 10–2 verdict for Cravens and the Partnership that included affirmative liability findings against

---

[8]The RCP Appellants state in their brief that although the partial summary judgment order reflects a dismissal with prejudice against CNDH and Willmar, CNDH and Willmar had voluntarily nonsuited their claims before the trial court signed the partial summary judgment order. Regardless, neither CNDH nor Willmar was included within the jury charge or awarded damages in the final judgment.

11

Lake, Maguire, RCC, and RCP for fraudulent inducement and statutory fraud prior to the date of the Partnership Agreement; against Lake, RCC GenPar, and RCC for fraudulent inducement between the date of the Partnership Agreement and the date Willmar conveyed the property to the Partnership; against Lake for a securities law violation and Myers and RCC for materially aiding Lake in committing the securities law violation; against RCC for promissory estoppel; against Lake and RCC for unjust enrichment; and against RCC GenPar for breach of the Partnership Agreement. Relevant to this appeal, the jury's damage awards included $3,558,000 for fraudulent inducement and statutory fraud prior to the date of the Partnership Agreement; $3,558,000 for fraudulent inducement between the date of the Partnership Agreement and the date Willmar deeded the property to the Partnership; $1,548,000 for promissory estoppel; $317,500 for unjust enrichment; and $1,625,000 in trial and appellate attorney's fees. The jury did not award any damages for future lost profits.

The trial court signed the final judgment on August 8, 2011. The judgment states that Cravens and the Partnership made an election of remedies, choosing to recover for fraudulent inducement, statutory fraud, promissory estoppel, and unjust enrichment. The judgment awards damages of $8,664,000 to Cravens in his individual capacity and damages of $317,500 to the Partnership. The judgment also awards $1,625,000 to Cravens individually for trial and appellate

attorney's fees[9] and contains a judicial declaration that RCC GenPar was properly removed as general partner of the Partnership.

## III. STANDING

The RCC Appellants and the RCP Appellants contend in their respective first issues that Cravens did not have standing to recover damages in his individual capacity.

### A.    Standard of Review

Standing focuses on the question of who may bring an action. *See Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). Standing is a component of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993); *see also DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) ("A court has no jurisdiction over a claim made by a plaintiff without standing to assert it."). We review standing under the same standard by which we review subject-matter jurisdiction generally. *Tex. Air Control Bd.*, 852 S.W.2d at 446. Whether the trial court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

---

[9]The award of attorney's fees to Cravens was based on the statutory fraud theory. *See* Tex. Bus. & Com. Code Ann. § 27.01(e) (West 2015) (providing for recovery of "attorney's fees, expert witness fees, costs for copies of depositions, and costs of court" for statutory fraud).

### B. Damage Awards to Cravens Individually

The trial court's judgment awards damages of $8,664,000 to Cravens in his individual capacity. Of those damages, $1,476,000 are for lost profits sustained in the past, with half of that amount ($738,000) for fraud prior to the date of the Partnership Agreement and the other half ($738,000) for fraud between the date of the Partnership Agreement and the date Willmar deeded the property to the Partnership.[10] The jury also awarded Cravens $5,640,000 in damages for the difference in value between what he was promised and what he received as of the date the Partnership Agreement was signed, with half of that amount ($2,820,000) for fraud occurring prior to the Partnership Agreement and the other half ($2,820,000) for fraud between the date of the Partnership Agreement and the date Willmar deeded the property to the Partnership in October 2008. The remaining $1,548,000 in damages awarded to Cravens individually are for promissory estoppel and are based on the jury's affirmative finding that Cravens substantially and foreseeably relied to his detriment on RCC's promise to develop and build the hospital and related structures.

### C. Party Contentions

Appellants make two principle arguments relating to Cravens's standing to recover damages individually. They argue that the legal right to recover damages belonged to the entity that was allegedly harmed, meaning that only the

---

[10]Each of the lost profits damage questions asked the jury to determine the "[l]ost profits, if any, sustained in the past that derive from Dr. Cravens'[s] interest in the Partnership."

Partnership, Willmar, or CNDH could recover the alleged fraud and promissory estoppel damages. Appellants also argue that Cravens was not personally harmed because he did not personally part with anything of value since Willmar contributed the property to the Partnership and because CNDH paid rent to the Partnership. Cravens responds that although the property was technically owned by Willmar before Willmar deeded it to the Partnership, the parties treated the participant individuals and entities as indistinguishable throughout the transaction (including the recitations in the various letters of intent that preceded the Partnership Agreement) and that Cravens's capital contribution into the Partnership was valued at $3.2 million once Willmar contributed the property. Cravens also points out that Willmar received no benefit from the transfer of the property into the Partnership, that Cravens personally received an option to purchase the hospital in the future, and that all writings executed contemporaneously must be considered together. In other words, Cravens argues that, looking at the various contracts executed contemporaneously with the Partnership Agreement, the parties intended that Cravens would individually benefit from the deal.[11]

---

[11]We agree with Cravens's contention that all writings involved in this transaction may be considered together to determine the parties' intent, and we treat all the transaction documents as a "single, unified instrument" for that purpose. *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). But we are not at liberty to disregard the legal entities created by the transaction documents to reach a result not permitted by Texas law. *See DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999) ("[T]his rule is simply a device for ascertaining and giving effect to the intention of the parties and cannot be

## D. Lost Profit Damages

We begin by determining whether Cravens, in his individual capacity, may recover damages for past lost profits.[12] Texas law is established that shareholders have no individual or direct claim for injuries sustained by the corporation. *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990); *see Sneed v. Webre*, 465 S.W.3d 169, 188 (Tex. 2015). Courts of appeals have similarly applied this rule to other types of legal entities, including Subchapter S corporations, limited liability companies, and limited partnerships. *See Singh v. Duane Morris, L.L.P.*, 338 S.W.3d 176, 181–82 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (holding sole shareholder of Subchapter S corporation had "no standing to recover personally for damages incurred by the corporation"); *Asshauer v. Wells Fargo Foothill*, 263 S.W.3d 468, 470–73 (Tex. App.—Dallas 2008, pet. denied) (holding individuals owning limited partnership interests had no standing to sue for damages allegedly caused to limited partnership); *Swank v. Cunningham*, 258 S.W.3d 647, 662 (Tex. App.—Eastland 2008, pet. denied) (holding negligence claim belonged to corporation and that individuals claiming to be shareholders had no standing to maintain action for individual damages); *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 247, 250–51 (Tex. App.—Dallas

---

applied arbitrarily."); *Miles v. Martin*, 159 Tex. 336, 341, 321 S.W.2d 62, 65 (1959) (stating the same).

[12]Because the jury did not award any damages to Cravens or the Partnership for future lost profits, our discussion of lost profits damages is necessarily limited to lost profits allegedly sustained in the past.

16

2005, no pet.) (holding limited liability company and its sole owner had no standing to recover damages for harm allegedly done to limited partnership in which LLC owned limited partnership interest).

In this case, Cravens received a 99.8% limited partnership interest in the Partnership. For each of the fraud questions, the jury was asked to determine the amount of "[l]ost profits, if any sustained in the past *that derive from Dr. Cravens'[s] interest in the Partnership.*" [Emphasis added]. Even assuming that sufficient evidence supports the jury's findings as to the amount of lost profits sustained in the past, any profits lost as a result of Appellants' alleged fraud belong, as a matter of law, to the Partnership and not to Cravens. *See Wingate*, 795 S.W.2d at 719. "[I]njury to the property of a corporation, or the impairment or destruction of its business, is vested in the corporation, as distinguished from its stockholders, even though it may result indirectly in loss of earnings to the stockholders." *Id.* (quoting *Massachusetts v. Davis*, 140 Tex. 398, 406–07, 168 S.W.2d 216, 221 (1942), *cert. denied*, 320 U.S. 210 (1943)); *see also Singh*, 338 S.W.3d at 180–82 (holding sole shareholder had no standing to recover profits lost by Subchapter S corporation); *Nauslar*, 170 S.W.3d at 248, 251 (holding that "[t]he right of recovery is [the limited partnership]'s right alone, even though the economic impact of the alleged wrongdoing may bring about reduced earnings, salary or bonus" to those holding interests in the partnership). It matters not that Cravens held a 99.8% limited partnership interest in the Partnership because even the sole shareholder of a Subchapter S corporation has no standing to

17

recover for wrongs allegedly done to that corporation.[13]  *Singh*, 338 S.W.3d at 181–82.

As a matter of law, Cravens does not have standing as the 99.8% limited partner in the Partnership to recover individually for lost profits that allegedly "derive from [his] interest in the Partnership."  *See Wingate*, 795 S.W.2d at 719. Any damages must be recovered by the entity to avoid duplicitous suits and damage awards and to ensure that any damages are available to pay the entity's creditors or to proportionately distribute to the entity's owners.[14]  *See id.* (quoting *Davis*, 140 Tex. at 406–07, 168 S.W.2d at 221); *see also Singh*, 338 S.W.3d at 181–82 (holding sole shareholder of corporation had no standing to recover lost profits); *Nauslar*, 170 S.W.3d at 250–51 (holding sole owner of limited partnership had no standing to recover distributions, profits, and other benefits of ownership he would have received).

Cravens argues alternatively that because the jury found that he properly removed RCC GenPar as the general partner of the Partnership, his status as general partner allowed him to recover damages that may have been suffered by the Partnership.  However, Cravens was not the general partner of the

---

[13]It also matters not that one fraud theory related to alleged fraud predating the Partnership Agreement because the jury was only asked to determine damages based on Cravens's 99.8% interest in the Partnership, not whether Cravens personally had lost profits before entering into the Partnership Agreement.

[14]Although Cravens relies in part on his personal option to purchase the hospital in the future to establish his standing to sue individually, the jury awarded no damages to Cravens for future lost profits.

Partnership at the time of trial and judgment. Thus, even if he arguably had authority at one time to act as general partner on behalf of the Partnership, he did not have that authority by the time of trial and judgment.

Moreover, the Partnership Agreement only allowed the general partner to bring a lawsuit "on behalf of" the Partnership, specifically stating that the general partner had the power to "institute, prosecute, defend and settle any legal, arbitration or administrative actions or proceedings on behalf of or against the Partnership." That contractual authorization did nothing to change the bedrock principle that only the legal entity has standing to recover damages incurred by the entity. *See Singh*, 338 S.W.3d at 182 (stating that one of the "bedrock principle[s] of corporate law is that a corporation cannot be used when it benefits the stockholders and be disregarded when it is to the advantage of the organizers to do so"). Rather, it merely restated the law that the general partner in a limited partnership has the right to manage and conduct the business of the partnership; it did not grant the general partner the authority to recover damages that belong to the Partnership in the general partner's name. *See* Tex. Bus. Orgs. Code Ann. § 153.152(a)(1) (West 2012) (stating general partner in limited partnership has rights of partner in a general partnership); *id.* § 152.203 (West 2012) (outlining partners' rights to manage and conduct business of partnership); *see also Wingate*, 795 S.W.2d at 719 (noting that damages must be recovered by corporation so they are available to pay corporate creditors or to proportionately distribute to stockholders) (quoting *Davis*, 140 Tex. at 406–07,

19

168 S.W.2d at 221); *see generally* Tex. Bus. Orgs. Code Ann. § 153.401 (West 2012) (granting limited partner authority to bring derivative suit "on behalf of the limited partnership t*o recover a judgment in the limited partnership's favor*" if certain conditions are met (emphasis added)).

The jury was only asked to determine the amount of lost profits that "derive from Dr. Cravens'[s] interest in the Partnership," and the final judgment awarded those lost profits damages to Cravens individually. But Cravens has no standing to recover those damages in his individual capacity. We therefore sustain the part of the RCC Appellants' and the RCP Appellants' respective first issues that challenge the award of $1,476,000 in past lost profits to Cravens in his individual capacity.

### E.    Benefit of the Bargain Damages

The jury also awarded Cravens benefit-of-the-bargain damages of $2,820,000 for fraud before the date of the Partnership Agreement and $2,820,000 for fraud between the date of the Partnership Agreement and the date that Willmar deeded the property to the Partnership. Damages for the difference between the value agreed to or represented and the value actually received are benefit-of-the-bargain damages. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009); *see also Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998); *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 346 (Tex. App.—Fort Worth

20

2003, pet. denied). A party may recover benefit-of-the-bargain damages for fraud. *See Formosa Plastics Corp. USA*, 960 S.W.2d at 49.

For the benefit-of-the-bargain damages, Cravens argues that he has standing because the legal duty was owed to him individually by Appellants and not to the Partnership, meaning the claims are personal to him. In this regard, the Supreme Court of Texas has explained that although "[a] corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong," that "rule does not, of course, prohibit a stockholder from recovering damages for wrongs done to him individually 'where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder.'" *Wingate*, 795 S.W.2d at 719 (quoting *Davis*, 140 Tex. at 408, 168 S.W.2d at 222).

Based on the evidence presented to the jury in this case, Cravens also does not have standing to recover the benefit-of-the-bargain damages because he presented no evidence that he was personally aggrieved by the alleged fraud. Willmar owned the property and deeded it to the Partnership.[15] And even if Cravens owned all or part of Willmar, only Willmar was entitled to pursue damages for fraudulent inducement relating to the conveyance of the property into the Partnership because only the legal entity that owns the property may sue for damage to that property. *See id.* ("[T]he cause of action for injury to the property of a corporation . . . is vested in the corporation.") (quoting *Davis*, 140

---

[15]Cravens signed the deed, but he did so as the general partner of Willmar.

Tex. at 407, 168 S.W.2d at 221). Cravens was thus not damaged by Willmar's conveyance of the property to the Partnership even though Willmar may have been harmed. *See generally Willis v. Marshall*, 401 S.W.3d 689, 696 (Tex. App.—El Paso 2013, no pet.) ("A person who is personally aggrieved by the alleged wrong has standing to sue.") (citing *Nootsie Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)). The same logic applies to the $1.5 million in rent paid to the Partnership. Cravens was not personally aggrieved by the payment of rent because he did not make the payments; CNDH paid the rent. Cravens does not have standing to assert claims for damages based on injury allegedly caused to Willmar or CNDH. *See Asshauer*, 263 S.W.3d at 471–72 (discussing *Nauslar*, 170 S.W.3d at 250).

Finally, to the extent Cravens argues that his 99.8% interest in the Partnership was not worth what it should have been because of Appellants' alleged fraud, i.e., that his $3,320,000 limited partnership interest was not actually worth that amount because of Appellants' alleged fraud,[16] that claim belongs to the Partnership, and Cravens did not have standing to pursue it. Diminished value of an ownership interest as a result of allegedly tortious conduct is not an individual claim; the claim instead belongs to the legal entity. *Nauslar*, 170 S.W.3d at 249–50. This is so "even where the wrong has depreciated the value of the shareholder's investment in the corporation,

---

[16]In his closing argument, Cravens's attorney argued to the jury that the value of Cravens's interest in the Partnership was "[n]othing."

22

impaired or destroyed its business, or otherwise harmed the shareholder." *Goeth v. Craig, Terrill & Hale, L.L.P.*, No. 03-03-00125-CV, 2005 WL 850349, at *5 (Tex. App.—Austin Apr. 14, 2005, no pet.) (mem. op.); *see Wingate*, 795 S.W.2d at 719 (holding claim for misappropriation of corporate assets belonged to corporation, not to sole shareholder); *see also Asshauer*, 263 S.W.3d at 472 (holding limited partners who collectively invested $30 million in partnership had no standing to sue another limited partner because claim that $30 million investment was total loss belonged to the partnership, not the limited partners); *Nauslar*, 170 S.W.3d at 250–51 (holding corporation owned claim related to damage to corporation's value resulting from tortious conduct). We sustain the remainder of the RCP Appellants' first issue and the part of the RCC Appellants' first issue that challenges Cravens's standing to recover benefit-of-the-bargain damages.

### F. Promissory Estoppel

In the remainder of their first issue, the RCC Appellants contend that Cravens has no standing to recover the $1,548,000 awarded to him individually for promissory estoppel against RCC. Assuming for the moment that Cravens personally made expenditures or materially changed his position in reliance on RCC's promise to develop and build the hospital, he has standing to assert that claim in his individual capacity because it would be a loss personal to him in that the jury found that Cravens personally made expenditures "in preparation or

23

performance in reliance upon [RCC's] promise."[17]  *See Willis*, 401 S.W.3d at 696

("A person who is personally aggrieved by the alleged wrong has standing to

sue.") (citing *Nootsie*, 925 S.W.2d at 661); *see also Wheeler v. White*, 398

S.W.2d 93, 97 (Tex. 1965) (recognizing cause of action for promissory estoppel

that permits recovery of damages for detrimental reliance on a promise in the

absence of a binding contract).  This differs from the discussion of other

damages above because the promissory estoppel claim is an extra-contractual

claim belonging to Cravens individually.  We therefore overrule the remainder of

the RCC Appellants' first issue.

## IV.  PROMISSORY ESTOPPEL DAMAGES

In part of their sixth issue, the RCC Appellants contend that legally

insufficient evidence supports the jury's award of $1,548,000 in reliance

damages to Cravens.

### A.    Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record

discloses a complete absence of evidence of a vital fact; (2) the court is barred

by rules of law or of evidence from giving weight to the only evidence offered to

prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a

mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital

fact.  *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998),

---

[17]We address the sufficiency of the evidence to support the jury's damage award for promissory estoppel in the next section of this opinion.

*cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

### B.    Discussion

Generally, promissory estoppel is a viable alternative to breach of contract. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Promissory estoppel is not applicable to a promise covered by a valid contract between the parties, but the doctrine will apply to a promise outside a contract. *See Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex. App.—San Antonio 2002, no pet.). "The damages recoverable under this theory are not the profits the promisee expected from acting in reliance on the promise, but the amount necessary to put the promisee in the position he would have been in if he had not so acted." *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 794 (Tex. App.—Dallas 2007, no pet.).

The jury was asked to determine the amount of "[e]xpenditures made by Dr. Cravens in preparation or performance in reliance upon the promise" by RCC "to develop and build the hospital and related structures" and found that amount

25

to be $1,548,000. The RCC Appellants contend that there is no evidence to support this award. Cravens counters that the evidence is legally sufficient to support the $1,548,000 in reliance damages because the rent paid to the Partnership totaled $1.5 million, because the property conveyed to the Partnership had a value greater than the amount awarded by the jury, and because there is evidence that he spent more than $1 million in attorney's fees.

We agree that there is evidence that the Partnership received $1.5 million in rent payments between October 2008 and September 2010, but nothing in the record suggests that Cravens personally paid the rent. To the contrary, the evidence reflects that CNDH paid the rent to the Partnership. Reliance damages based on rent payments would thus belong to CNDH, not Cravens. *See Wingate*, 795 S.W.2d at 719; *Singh*, 338 S.W.3d at 181–82; *Asshauer*, 263 S.W.3d at 470–73; *Swank*, 258 S.W.3d at 662; *Nauslar*, 170 S.W.3d at 250–51. Similarly, the property deeded to the Partnership was valued at $4.87 million and led to a capital contribution of $3.32 million for Cravens, but the property was deeded to the Partnership by Willmar, not Cravens, meaning Cravens cannot personally recover reliance damages based on the conveyance of the property to the Partnership. *See Wingate*, 795 S.W.2d at 719; *Singh*, 338 S.W.3d at 181–82; *Asshauer*, 263 S.W.3d at 470–73; *Swank*, 258 S.W.3d at 662; *Nauslar*, 170 S.W.3d at 250–51.

The Dallas court of appeals addressed an analogous circumstance in *Lamajak*. *See* 230 S.W.3d at 794–95. There, the parties discussed a profit-

26

sharing arrangement by which Lamajak would provide Beanie Babies to Frazin to sell, with Frazin keeping all profits above $6 million. *Id.* at 790–91. Lamajak allegedly failed to pay Frazin his share of profits, and Frazin sued for breach of contract, promissory estoppel, and unjust enrichment. *Id.* at 791–92. Holding that Frazin presented no evidence of reliance damages to support his promissory estoppel theory, the court of appeals wrote,

> To recover reliance damages, Frazin was required to prove his personal expenditures or losses. Frazin did not provide any evidence to show how the changes he made to his corporation's business strategy affected his personal income or caused a loss to him personally. He presented no evidence of how corporate losses could be translated into personal losses. And Frazin presented no testimony about any out-of-pocket expenses or other costs he incurred personally in reliance on [Lamajak]'s alleged promise. We conclude, therefore, that there is no evidence to support the jury's verdict awarding Frazin damages for promissory estoppel.

*Id.* at 795.[18] Here, Cravens cannot rely on Willmar's conveyance of the property and CNDH's rent payments because those were not personal to him, meaning they are no evidence of expenditures by Cravens in reliance upon RCC's promise to develop and build the hospital.

Finally, Cravens points out that his attorneys were paid more than $1 million, and he argues that the attorney's fees support the award of reliance damages. However, the evidence shows that the fees were paid from CND's line of credit and not by Cravens individually. But even if Cravens personally paid some or all of the attorney's fees, his attorney's fees for prosecution of the

---

[18]Incidentally, the court also held that Frazin could not personally recover damages for harm to his wholly owned corporation. *Id.* at 794–95.

27

lawsuit are not expenditures made in reliance on RCC's promise to develop and build the hospital. They are expenditures made for purposes of recovering damages in this lawsuit, and as such, they are not compensatory, out-of-pocket damages. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171–175 (Tex. 2013) (holding attorney's fees incurred in prosecuting or defending litigation are not compensatory damages and thus need not be superseded pending appeal under civil practice and remedies code section 52.006); *Alma Group, L.L.C. v. Palmer*, 143 S.W.3d 840, 846 (Tex. App.—Corpus Christi 2004, pet. denied) (holding party not entitled to recover attorney's fees without also recovering damages for breach of contract in part because "attorney fees are in the nature of costs, not damages"). Thus, Cravens points to no evidence in the record of expenditures he personally made in reliance upon RCC's promise to develop and build the hospital and related structures.[19]

We sustain the portion of the RCC Appellants' sixth issue that challenges the legal sufficiency of the evidence supporting the jury's award of promissory estoppel damages to Cravens individually. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334; *see also Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 928 (Tex. App.—Austin 2008, no pet.) (sustaining legal sufficiency challenge to promissory estoppel reliance damages); *Lamajak*, 230

---

[19]To the contrary, the undisputed evidence is that Cravens personally received almost $500,000 from the proceeds of the interim loan as reimbursement for his past expenditures.

S.W.3d at 794–95 (sustaining legal sufficiency challenge to promissory estoppel damages). We do not reach the remainder of the RCC Appellants' sixth issue. *See* Tex. R. App. P. 47.1.

## V. UNJUST ENRICHMENT

The RCC Appellants argue in their seventh issue that the trial court erred by rendering judgment for the Partnership on an unjust enrichment theory against Lake and RCC.

The jury found in response to Questions 40 and 41 that Lake and RCC were unjustly enriched "by receiving fees and compensation from the Partnership"; that Lake was unjustly enriched in the amount of $69,000; and that RCC was unjustly enriched in the amount of $248,500. The RCC Appellants contend that Texas law precludes application of unjust enrichment when the matter in dispute is covered by an express contract and that the Partnership Agreement explicitly provided for payment of the disputed fees to Lake and RCC. The Partnership responds that it had no written contract with either Lake or RCC and that the Partnership Agreement was nullified by fraudulent inducement. The RCC Appellants point out, though, that Cravens did not elect to rescind the Partnership as a remedy for fraud[20] and that unjust enrichment claims are

---

[20]Indeed, Cravens and the Partnership elected to have the trial court enter judgment on their declaratory judgment claim that RCC GenPar "was properly removed as the General Partner of [the Partnership] pursuant to the terms of the [Partnership] Agreement."

29

precluded for parties to a contract, as well as for third parties, if the subject matter of the dispute is covered by the contract.

A party generally cannot recover under an unjust enrichment theory if an express contract covers the subject matter of the dispute. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). "This rule is applicable not only when the plaintiff is seeking to recover in equity from the party with whom he expressly contracted, but also when the plaintiff is seeking recovery from a third party foreign to the original contract but who is alleged to have benefited from its performance." *Protocol Techs., Inc. v. J.B. Grand Canyon Dairy, L.P.*, 406 S.W.3d 609, 614 (Tex. App.—Eastland 2013, no pet.) (citing *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 160 (Tex. App.—Amarillo 2000, no pet.); *W & W Oil Co. v. Capps*, 784 S.W.2d 536, 537 (Tex. App.—Tyler 1990, no writ)). Here, the Partnership Agreement expressly provided the general partner with authority to pay "the Developer an overhead and supervision fee of $1,239,113, which shall be payable in equal monthly installments during the Project." The Partnership Agreement expressly defined RCC as the Developer, and there is no dispute that Lake was an officer of RCC.

The Partnership also argues that the contract provides that the development fees should not have been paid until the construction loan had been obtained and that Appellants told Cravens the fees would not be paid until the

construction loan had been funded. The Partnership Agreement defined the "Project" as "[t]he acquisition of the Property, and the development, construction and delivery to tenants of a fully operational . . . surgical/hospital . . . through the obtaining of a Construction Loan." Cravens argues that because the Partnership Agreement only allowed payment of development fees "during the project," the development fees should not have been paid because the "project" never commenced (since there was never a construction loan).[21] However, this argument relates to an interpretation of the contract and indisputably brings the dispute about the payment of development fees within the subject matter of the express contract. Thus, even though neither RCC nor Lake was a party to the Partnership Agreement, the dispute about the payment of development fees is a matter covered by the Partnership Agreement, which is an express contract. Under these circumstances, the Partnership cannot recover against RCC or Lake for unjust enrichment because an express contract covers the subject matter of the dispute. *See Protocol Techs., Inc.*, 406 S.W.3d at 614–15; *Hester*, 132 S.W.3d at 106; *W & W Oil Co.*, 784 S.W.2d at 537.

Finally, the Partnership argues that the unjust enrichment recovery should stand because the development fees constituted overpayments on the contract. But the Partnership's argument exceeds the scope of what the jury was asked to find. The jury was asked to find the amount that RCC and Lake were unjustly

---

[21]The RCC Appellants disagreed at trial with the Partnership's interpretation of the Partnership Agreement and argued that the development fees were expressly allowed by the Partnership Agreement.

enriched by "receiving fees and compensation from the Partnership" as a result of "fraud, duress[,] or the taking of undue advantage." The jury was not asked to determine the amounts of any overpayments under the Partnership Agreement. Thus, although we recognize the exception permitting recovery of overpayments under a contract on an unjust enrichment theory, *see Fortune Prod. Co.*, 52 S.W.3d at 684 (noting exception to unjust enrichment express-contract defense for overpayments on contract); *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 469–70 (Tex. 1998) ("[I]n some circumstances, overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment."), the exception cannot apply here in the absence of a question asking the jury to determine the amount of overpayments, if any, under the Partnership Agreement. We sustain the RCC Appellants' seventh issue.

## VI. INDEMNITY FOR MAGUIRE

In their ninth issue, the RCC Appellants contend that the trial court erred by denying Maguire's motion for judgment relating to his claim for contractual indemnity.

The indemnity provision of the Partnership Agreement states in relevant part as follows:

> Neither the General Partner, nor any member, manager, shareholder, director or officer thereof shall, however, be liable, responsible or accountable in damages or otherwise to any Partner for any acts performed by it or him in good faith and within the scope of this Agreement or any failure to act unless such act or failure to act is the result of gross negligence or fraud. To the fullest extent allowed by the [Texas Business Organizations Code] and other applicable law, the Partnership shall indemnify, defend against and

save harmless the General Partner and its officers . . . (each an "Indemnified Person") from any expenses (including reasonable attorney's fees and court costs)[,] liabilities, claims, causes of action, losses or damages incurred by reason of any act or omission performed or omitted by any Indemnified Person in good faith on behalf of the Partnership or any other Partner and in a manner reasonably believed by the Indemnified Person to be within the scope of the authority granted to it by this Agreement . . . .

Question 44 of the jury charge asked the jury as follows:

Beginning on February 15, 2008,[22] do you find that those named below acted in good faith on behalf of the Partnership or any other partner and in a manner reasonably believed by them to be within the scope of authority granted to them by the Partnership Agreement?

The jury found that Maguire acted in good faith but that Lake and RCC GenPar did not.

Based on the indemnification provision in the Partnership Agreement and the jury's answer to Question 44, the RCC Appellants contend that the trial court erred by denying Maguire's motion for judgment on his indemnity claim. The Partnership responds that Maguire's claim for indemnity is barred by the jury's fraud findings against Maguire in Questions 1 and 6 and that the business organizations code does not permit indemnification if the one seeking it has been found liable to the enterprise for "wilful or intentional misconduct in the performance of the person's duty to the enterprise." Tex. Bus. Orgs. Code § 8.102(b)(3)(A) (West 2012). The Partnership also argues that there is no evidence that Maguire actually incurred attorney's fees in this case.

_____

[22]The Partnership Agreement was executed on February 15, 2008.

Arguing that the fraud findings against Maguire prohibit indemnification, the Partnership points to the first sentence quoted above and contends that the Partnership Agreement prohibits indemnification for acts of fraud and gross negligence. However, that sentence does not address indemnification. By its plain language, the sentence relates to liability "to any Partner" and provides that liability to a partner could result from gross negligence or fraud. The sentence does not apply to the Partnership's indemnification of an officer.

The Partnership, again relying on the jury's fraud findings, also references section 8.102(b)(3) of the business organizations code and argues that the trial court properly denied Maguire's claim for indemnity because Maguire was found liable for wilful or intentional misconduct. *See id.* Section 8.102(b)(3)(A) provides in relevant part that

> (b) Indemnification under this subchapter of a person who is found *liable to the enterprise* or is found liable because the person improperly received a personal benefit:
>
> . . .
>
> (3) may not be made in relation to a proceeding in which the person has been found liable for:
>
> > (A) wilful or intentional misconduct in the performance of the person's duty to the enterprise.

*Id.* (emphasis added). This section also does not preclude Maguire's claim for indemnity because Maguire has not been "found liable to the enterprise." *Id.* Indeed, the jury was not asked whether Maguire should have any liability to the Partnership. Rather, all of the jury questions asking about Maguire's conduct

34

related to alleged liability to Cravens, not to the Partnership. And in response to the only question asked of the jury about Maguire's conduct toward the Partnership, the jury found that Maguire acted in good faith. Therefore, Maguire has not been found liable to the Partnership, and section 8.102(b)(3)(A) does not preclude his claim for indemnity. *See id.*

The Partnership next argues that there is no evidence that Maguire actually incurred attorney's fees in the case. The Partnership presumably relies on business organizations code section 8.102(a)(2), which provides in pertinent part that an enterprise may indemnify a governing person or delegate against expenses "that are reasonable and *actually incurred* by the person in connection with a proceeding." *Id.* § 8.102(a)(2) (emphasis added). The business organizations code does not define "actually incur" or "incur," nor do any of the parties point us to any case law definitions that would guide our analysis. Having not located any cases analyzing "actually incurred" as used in section 8.102(a)(2), we note that the Supreme Court of Texas has addressed a provision in chapter 74 of the civil practice and remedies code that contains similar language. *See Garcia v. Gomez*, 319 S.W.3d 638, 642–43 (Tex. 2010) (holding some evidence existed that physician incurred fees because services had been performed on the physician's behalf); *Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (holding physician entitled to recover attorney's fees actually paid by malpractice insurer because physician was "personally liable in the first instance").

35

Section 74.351(b)(1) of the civil practice and remedies code provides for an award of "reasonable attorney's fees and costs of court *incurred by the physician*" if the plaintiff does not timely serve an adequate expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)(1) (West Supp. 2014) (emphasis added). In *Garcia*, the plaintiff did not serve the required expert report, and the trial court dismissed the case pursuant to the requirements of civil practice and remedies code section 74.351(b) but did not award attorney's fees. 319 S.W.3d at 640; *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). The court of appeals affirmed the trial court's denial of attorney's fees and held that there was "no evidence of the reasonable fees incurred by the physician in defense of the claim." *Garcia*, 319 S.W.3d at 640. The supreme court reversed, holding that although the evidence was not conclusive, the testimony by the physician's attorney was some evidence that the attorney's fees were reasonable and that the physician had incurred attorney's fees. *Id.* at 642–43. The supreme court noted that services had been performed in the lawsuit on the physician's behalf and that "[w]hile there is no evidence about what Dr. Garcia (or perhaps his insurance carrier) agreed to pay for these services, it blinks reality to assume that the attorney was a volunteer or that Dr. Garcia did not incur attorney's fees for this work." *Id.* at 642. One year earlier, the supreme court reached a similar result when it held that a physician had incurred attorney's fees even though his malpractice insurer had actually paid the attorney's fees on his behalf, stating that the physician was "personally liable in the first instance for both defense

36

costs and any potential judgment" and that his procurement of insurance did not mean that the physician had not incurred attorney's fees. *See Aviles*, 292 S.W.3d at 649.

Here, one of the RCC Appellants' attorneys testified that his law firm represented RCC, RCC GenPar, Maguire, and Lake in the litigation. The attorney generally described for the jury the services that he and the other attorneys had performed on the RCC Appellants' behalf as well as the law firm's practice of tracking hours on a monthly basis and mailing invoices to the clients for payment. The attorney acknowledged that he did not know who among his firm's clients reviewed the law firm's bills and authorized payment, but even if another of the RCC Appellants paid or advanced money for Maguire's attorney's fees, Maguire was still "personally liable in the first instance" for the attorney's fees. *See Aviles*, 292 S.W.3d at 649. The attorney's testimony thus constitutes some evidence that Maguire actually incurred attorney's fees in this litigation. *See Garcia*, 319 S.W.3d at 642–43; *Aviles*, 292 S.W.3d at 649.

Returning, then, to whether the trial court erred by denying Maguire's motion for judgment on his claim for indemnification, the Partnership Agreement provides for indemnification of an officer like Maguire if the officer acted in good faith on behalf of the Partnership, and the jury found in response to Question 44 that Maguire acted in good faith. The jury also found in response to Question 48 that reasonable and necessary attorney's fees for the RCC Appellants were $492,971 through trial and a total of another $200,000 for appeals to the court of

appeals and the supreme court. The trial court therefore erred by denying Maguire's motion for judgment on his claim for contractual indemnity from the Partnership.

We cannot, however, render judgment for Maguire because the amount of attorney's fees found by the jury includes more than those incurred by Maguire in his defense. Rather, the jury's answer to Question 48 includes attorney's fees for the defense of Lake and RCC GenPar and attorney's fees for prosecuting the RCC Appellant's counterclaim for a judicial declaration that RCC GenPar was not properly removed as general partner, a counterclaim on which the RCC Appellants did not prevail at trial and have not appealed. Moreover, the RCC Appellants' attorney did not segregate these different types of attorney's fees during his testimony. We therefore cannot render judgment for Maguire on his claim for indemnification and must instead remand the matter to the trial court for reconsideration of the amount that Maguire should receive as indemnification under the Partnership Agreement. *See generally Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314–15 (Tex. 2006) (remanding for further proceedings because "[u]nsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be"). We sustain in part and overrule in part the RCC Appellants' ninth issue.

## VII. REMAINING ISSUES AND REMAND FOR NEW ELECTION OF REMEDIES

Through our holdings above that Cravens has no standing in his individual capacity to recover the damages awarded by the jury for common law and

38

statutory fraud, that Cravens presented no evidence of reliance damages for promissory estoppel, and that the Partnership's claim for unjust enrichment is barred by the express contract covering the subject matter of the development fees, we have reversed all parts of the judgment that awarded damages to Cravens and the Partnership. We therefore need not address Appellants' other issues, including their challenges to the legal and factual sufficiency of the evidence to support the damage awards, the admissibility of expert testimony, and Cravens's alleged failure to segregate his attorney's fees. *See* Tex. R. App. P. 47.1 (requiring appellate courts to address each issue necessary to the disposition of the appeal). We have also not addressed the RCP Appellants' fourth issue concerning the jury's findings as to a securities law violation because Cravens did not elect recovery on that theory of liability. *See id.*

We cannot, however, render judgment for Appellants on all claims asserted against them by Cravens and the Partnership. When a jury finds in favor of a party on more than one alternative theory of recovery, it is generally proper for an appellate court to remand for that party to make a new election of remedies in the event the appellate court renders judgment against the party on the claims for which the party initially elected to recover. *See Drury Sw., Inc. v. Louie Ledeaux #1, Inc.,* 350 S.W.3d 287, 293 (Tex. App.—San Antonio 2011, pet. denied); *Myre v. Meletio,* 307 S.W.3d 839, 846 (Tex. App.—Dallas 2010, pet. denied); *see also Smith v. Davis,* No. 12-12-00169-CV, 2013 WL 2424266, at *6–7 (Tex. App.—Texarkana Jun. 5, 2013, no pet.) (mem. op. on reh'g). Here, we

39

have held that Cravens has no standing for the fraud damages awarded by the jury and that he presented legally insufficient evidence of promissory estoppel damages. But the jury found in response to Questions 11 through 15 that Lake and RCC committed a securities law violation, and the jury found in response to Questions 25 through 27 that RCC GenPar failed to comply with the Partnership Agreement and that Cravens should recover damages for that breach of contract. We thus remand so that Cravens may make a new election of remedies. *See Drury Sw., Inc.*, 350 S.W.3d at 293; *Myre*, 307 S.W.3d at 846; *see also Smith*, 2013 WL 2424266, at *6–7. Once Cravens makes that election, the parties should first address with the trial court any remaining uncertainties concerning those theories of liability, including the award, if any, and assessment of attorney's fees, and then the parties may file a new appeal if necessary. At this point, however, the circumstances surrounding the securities law and breach of contract theories are not fully briefed by the parties or developed by the appellate record, especially considering that Cravens did not elect to recover on either of those theories of liability. Any discussion of those matters in this opinion would therefore be advisory and speculative. *See Camarena v. Tex. Emp't Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988) ("It is fundamental that a court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe."); *Jefferson v. Holmes*, No. 02-08-00318-CV, 2009 WL 806871, at *1 (Tex. App.— Fort Worth Mar. 26, 2009, no pet.) (mem. op.) ("[A]n appellate court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe or

to decide a case on speculative, hypothetical, or contingent fact situations."). We thus hold that remand to the trial court is necessary and appropriate.

## VIII. CONCLUSION

Having sustained all of the RCP Appellants' first issue and parts of the RCC Appellants' first issue, we reverse the portions of the trial court's judgment that awarded damages for fraud to Cravens individually and dismiss those claims for lack of jurisdiction based on Cravens's lack of standing. Because we have sustained part of the RCC Appellants' sixth issue for legally insufficient evidence, we reverse the part of the trial court's judgment that awarded Cravens $1,548,000 in damages for promissory estoppel and render judgment that Cravens take nothing on that claim. Having sustained part of the RCC Appellants' ninth issue, we reverse the portion of the trial court's judgment that denied any recovery to Maguire on his claim for contractual indemnification from the Partnership. Finally, having overruled or not reached Appellants' other issues, we remand the remainder of this case to the trial court for further proceedings consistent with this opinion.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: DAUPHINOT, MEIER, and GABRIEL, JJ.

DELIVERED: October 29, 2015

41